| | | | |
|---|---|---|---|
| LYDIA CLEMMONS, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 10-0911 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 53, 56 |
| | : | | |
| ACADEMY FOR EDUCATIONAL | : | | |
| DEVELOPMENT, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### GRANTING AED'S MOTION FOR SUMMARY JUDGMENT; AND
### DENYING THE FHI 360 DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS MOOT

## I. INTRODUCTION

Plaintiff, Dr. Lydia Clemmons, worked for defendant, the Academy for Educational Development ("AED"), in carrying out an HIV prevention project before she resigned in March 2009. She since has filed the instant lawsuit against AED alleging constructive discharge, retaliation, and hostile work environment on the basis of race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e *et seq.*, and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §1-2501 *et seq.*, as well as a claim for defamation under District of Columbia common law. Now before the Court is AED's motion for summary judgment as to each of these claims.[1] Upon consideration of the parties' motions, the memoranda

---

[1]    Dr. Clemmons also joined as a co-defendant Family Health International, d/b/a FHI 360, FHI Development 360 LLC, and FHI Solutions LLC (collectively, the "FHI 360 Defendants"), as AED's successor in interest. The FHI 360 Defendants separately moved for summary judgment on the basis that successor liability does not exist as to every state and federal claim. *See* Defs.' Supp. Mot. Summ. J., ECF No. 53. Because the Court grants summary judgment for AED as to all claims, the Court will deny as moot the FHI 360 Defendants' motion.

in support thereof and opposition thereto, and the evidentiary record submitted by both parties to

supplement their filings, the Court will grant AED's motion for summary judgment.

## II. FACTUAL BACKGROUND

### A. AED's Structure and Operations

During the relevant events, AED was a Delaware non-profit company based in

Washington, D.C. that operated domestic and international human and social development

programs. *See* Stmt of Undisputed Facts, ¶ 1, Dec. 13, 2013, ECF No. 56 ("SOF"). In particular,

AED oversaw two projects in Ghana that addressed HIV prevention for at-risk populations: the

Strengthening HIV and AIDS Response Partnership Project ("SHARP"), and the Ghana

Sustainable Change Project ("GSCP"). *See* SOF ¶ 2. The United States Agency for International

Development ("USAID") was the principal funder and client for both SHARP and GSCP. *See* 2d

Am. Compl. ("SAC") ¶¶ 8, 15, ECF No. 28. The Global Health Population and Nutrition Center

("GHPN") managed and directed GSCP, and AED, through its Center on AIDS & Community

Health ("COACH"), directed and managed SHARP. *See id.* ¶¶ 15-16. Both COACH and GHPN

operated out of AED's headquarters in the District of Columbia. *See id.*

Beth Anne Moskov, USAID's Director for Health, Population and Nutrition, managed

the U.S. Government's health-related funded activities in Ghana, including SHARP and GSCP,

starting in August 2005. *See* SOF ¶ 9; Moskov Dep. 7:20-8:4, Aug. 19, 2013, ECF No. 68-19.

Chief Technical Officers ("CTOs") reported on SHARP's and GSCP's daily activities and

progress to Ms. Moskov; specifically, Peter Wondergem was the CTO for SHARP, and Susan

Wright was the CTO for GSCP. *See* Moskov Dep. 18:14-19:3. Further, each Ghana project was

led by a chief of party ("COP"), and in May 2006, Dr. Clemmons, an African-American woman,

was hired to serve as the COP for SHARP. *See* SOF ¶ 4. On May 1, 2007, Jacqui Larsen started

as the Deputy COP for GSCP, until she received a promotion to COP in October 2007. *See id.* ¶ 6. Ms. Larsen's direct supervisor was Nancy Nachbar, the Senior Project Director for GHPN, *see id*. ¶ 7, and Dawn McCown became GSCP's Deputy COP in January 2009. *See id.* ¶ 8.

## B. Dr. Clemmons's Hiring and Salary Demands

Before agreeing to work for AED, Dr. Clemmons requested a salary of over $122,00, which was 15% more than her prior salary of $106,000, as well as a $40,430 increase over SHARP's previous COP's annual salary. *See id.* ¶¶ 12, 14. Under a cooperative agreement between USAID and AED, USAID was responsible for approving and paying Dr. Clemmons's salary, and USAID offered a maximum salary of $114,480 per year to Dr. Clemmons. *See id.* ¶ 14. AED, however, agreed to pay the difference from of its pool of unrestricted funds in order to complete Dr. Clemmons's hiring. *See* Def.'s Mot. Summ. J. at Ex. O-131-32; Beadle De Palomo Dep. 42:2-11, Nov. 6, 2013, ECF No. 68-12.

After joining AED, Dr. Clemmons received three annual merit-based salary increases in accordance with AED's "Annual Salary Review Guidelines," which were issued yearly by AED's president and CEO. The AED guidelines established a range of merit-based salary percentage increases that corresponded with an employee's base salary and annual performance rating. *See* Def.'s Mot. Summ. J. at Ex. O-88; O-139. In each of the three years, Dr. Clemmons received a performance rating of "4" on a scale of "1 to 4," which signified an "Excellent" rating. *See id.* at Exs. O-90, O-140, O-213.

In two of the three years, however, Dr. Clemmons received the minimum allowable percentage salary increase under AED's guidelines. *See id.* First, in 2006 she was entitled under the guidelines to a salary increase between 5.1% and 6.5%, and she received a 5.1% increase. *See id.* at Ex. O-139-40. Likewise, in 2008 Dr. Clemmons was entitled to a salary increase

between 4.5% and 6.0%, and she received the minimum salary increase of 4.5%. *See id.* at Ex. O-88. During the interim year of 2007, however, she was entitled to a salary increase between 4.1% and 5.5%, and she received a 5.0% increase. *See id.* at Ex. O-213. Two other high-performing COPs also received the minimum allowable salary increases in 2008. First, Stanley Terrell, a Caucasian COP for a project in the Dominican Republic, was eligible to receive a merit-based increase between 2.5% and 4.0%, and he received an increase of 2.5%. *See id.* at Ex. O-88; O-211. Second, Licida Bautista, a Latina COP for a project in Honduras, received a rating of "Excellent" and was eligible for a salary increase between 5.5% and 7.0%, and she received the minimum salary increase of 5.5%. *See id.* at Ex. O-88; O-212.

### C. The Relationship between SHARP and GSCP

Before and after Dr. Clemmons's arrival, SHARP and GSCP had a strained and challenging relationship. *See* McClintock Dep. 152:20-153:9, April 30, 2013, ECF No. 68-17; Nachbar Dep. 170:17-172:3, May 24, 2013, ECF No. 68-20; Beadle De Palomo Dep. 214:4-216:15. This was at least in part because the projects competed against each other for USAID's attention and resources, and the projects suffered from inadequate communication and strategic misalignment, which USAID recognized. *See* Def.'s Mot. Summ. J., Ex. O-180; Beadle De Palomo Dep. 214:4-216:15.

Following Ms. Larsen's promotion to COP in October 2007, the relationship between SHARP and GSCP, and particularly between Dr. Clemmons and Ms. Larsen, quickly worsened. As a result, USAID directed AED to adopt a Joint Implementation Plan ("JIP") to facilitate collaboration between the projects and to implement more efficient communication strategies for HIV prevention in Ghana. *See* Clemmons Dep. 170:11-171:10, Aug. 2, 2013, ECF No. 13; Moskov Dep. 66:17-67:15. The JIP, however, increased GSCP's involvement in the HIV work

that SHARP had been performing independently, which further strained the relationship between the projects. *See* Moskov Dep. 67:16-68:17. In particular, Dr. Clemmons has identified three examples to showcase the strained relationship between the projects during this time period.

First, in September 2007 Dr. Clemmons participated in a JIP meeting led by her immediate supervisor, Michael Kaplan. During a break in the meeting, Dr. Clemmons expressed concerns to Mr. Kaplan and Ms. Larsen about how the meeting was being conducted, as well as what she perceived to be technical gaps in GSCP's work product. *See* Clemmons Dep. 183:3-189:5. When Dr. Clemmons tried to follow up about implementing technical changes, Ms. Larsen refused to modify the activities identified during the JIP design meeting. *See id.*

Second, after that meeting, Dr. Clemmons and Ms. Larsen held additional meetings about implementing the JIP; these meetings, however, were often contentious, which only increased the hostility between the projects. Dr. Clemmons testified that during these meetings, Ms. Larsen was hostile, impatient, and verbally abusive. *See id.* at 108:17-111:1. In addition, Ms. Larsen repeatedly interrupted Dr. Clemmons, spoke over her, and dismissed or ignored all of Dr. Clemmons's comments and suggestions. *See id.* at 119:17-120:13.

Third, during a February 2008 meeting, Dr. Nachbar warned Dr. Clemmons to avoid discussing GSCP with anyone from USAID unless someone from GSCP was present. Dr. Clemmons testified that GSCP staff were not given the same instruction regarding SHARP. *See id.* at 238:2-239:4.

AED, on the other hand, provides evidence that Dr. Clemmons's attitude and persistent criticism of Ms. Larsen and GSCP contributed to the deteriorating relationship between the projects. For example, AED notes that Dr. Clemmons repeatedly criticized GSCP's technical expertise, such as by saying that GSCP had "performance problems," Def.'s Mot. Summ. J., Ex.

O-119; O-120, and by accusing GSCP of doing "slap-dash work" that required correcting, *see* SOF ¶ 32. GSCP members also complained about Dr. Clemmons verbally attacking them when providing technical feedback. *See* Clemmons Dep. 106:18-108:3. Due to the worsening relationship between the projects, Frank Beadle De Palomo, the Director of COACH, met with Dr. Clemmons and Ms. Larsen during his April 2008 site visit, but his efforts did not alleviate the tensions. *See* SOF ¶ 46.

On July 7, 2008, Cheryl Mayo took over as the Senior Project Director at COACH, making her Dr. Clemmons's direct supervisor. *See* SOF ¶ 51. In this position, Ms. Mayo supervised four international HIV programs within COACH, *see* Mayo Dep. 54:6-20, June 18, 2013, ECF No. 68-16, and she reported to Mr. Beadle De Palomo, who oversaw personnel, management, donor relations, and organizational policy for all HIV program, *see id.* at 55:7-61:19; Beadle De Palomo Dep. 10:21-11:6. At one point, Mr. Beadle De Palomo informed Ms. Mayo about the issues between GSCP and SHARP, and in doing so, he stated that Dr. Clemmons was "very intelligent, [had] a lot of experience, [had] a commanding presence, and look[ed] like Vanessa Williams." Beadle De Palomo Dep. 189:7-18, 208:13-209:2. According to Ms. Mayo, Mr. Beadle De Palomo also said that Dr. Clemmons "intimidates the dowdy, white women of the Ghana Sustainable Change Project." Mayo Dep. 89:13-17.

### D. The July 13, 2008, Email and Subsequent Investigation

On July 13, 2008, Ms. Nachbar emailed Peggy Parlato and Mark Rasmuson, her supervisors at GHPN, about Dr. Clemmons's conduct during a meeting with USAID. *See* Def.'s Mot. Summ. J., Ex. O-5. Because Ms. Nachbar did not attend the meeting, the information provided in her email was derived from a telephone conversation with Ms. Larsen. *See id.*; Nachbar Dep. 153:07-155:9. In the email, Ms. Nachbar wrote that Dr. Clemmons was "out of

control and attempts to manage her have failed." Def.'s Mot. Summ. J., Ex. O-5. Ms. Nachbar

concluded the email with the following recommendation:

> There need[s] to be consequences for Lydia's behavior. In the past, AED was
> reluctant to act because of fear of how the client would react. Susan's reaction to
> the meeting is clear evidence that she, at least, has little regard for Lydia. I believe
> Lydia should be removed. But, if that's not going to happen, there need[s] to be
> consequences.

*Id.* Separately, Ms. Nachbar emailed Mr. Beadle De Palomo with the same information. *See*

Beadle De Palomo Dep. 225:9-11.

After receiving the email, Mr. Beadle De Palomo contacted Dr. Clemmons to inform her

about what Ms. Nachbar had written, and he also initiated an investigation into whether Ms.

Nachbar was accurately portraying the joint meeting. *See* Def.'s Mot. Summ. J., Ex. O-76.

During the investigation, Mr. Beadle De Palomo spoke with meeting attendees from SHARP,

GSCP, and USAID, reviewed relevant documents, *see id.* at Ex. 57, and spoke with Ms. Larsen,

*see* Beadle De Palomo Dep. 227:7-19. At the end of his investigation, Mr. Beadle De Palomo

concluded that there was no merit to the allegations in Ms. Nachbar's email. Accordingly, on

July 16, 2008, he sent an email to Ms. Nachbar criticizing her judgment and stating that she

should have listened to both sides before sending the email. *See* Def.'s Mot. Summ. J., Ex. O-58.

AED then disciplined Ms. Nachbar by limiting her visibility with senior management and

denying her desirable roles within the organization. *See* Beadle De Palomo Dep. 153:13-157:18.

Mr. Beadle De Palomo communicated the results of the investigation to Dr. Clemmons,

and he told her that Ms. Nachbar's opinion would not adversely affect her employment at AED.

*See* Beadle De Palomo Dep. 231:5-232:17. He also informed Dr. Clemmons that he possessed a

favorable opinion of her and her work for SHARP. *See id.* Dr. Clemmons thanked Mr. Beadle De

Palomo for the investigation and his support, but she still felt compelled to raise the issue with

AED's Human Resources Department. *See* Def.'s Mot. Summ. J., Ex. O-78.

Mr. Beadle De Palomo responded by warning Dr. Clemmons that she would be making the complaint "alone and without [his] support." *Id.* He also explained that the complaint "will only create worse feeling[s] between you and GSCP, and will most definitely make the situation worse. It will swallow your time and make you less productive … which will have a direct impact on your performance and my view and review of your work." *Id.* Nonetheless, Mr. Beadle De Palomo reassured Dr. Clemmons that "Jacqui, Nancy, GHPN, have nothing to do with your professional reputation. If you do a good job, the project accomplishes its deliverables, then everything will be fine." *Id.* Ms. Mayo emailed Dr. Clemmons with the same advice, though she also encouraged Dr. Clemmons to "take a step back" from the situation. *Id.*

### E.  The Formal Grievance and Investigation

Dr. Clemmons filed a formal grievance on October 7, 2008, with AED's Chief Management Officer, Ricardo Villeta, claiming that she experienced workplace mobbing, bullying, and malicious gossip. *See* Def.'s Mot. Summ. J., Ex. O-1. Upon receipt of the grievance, Marti McClintock, the AED's Senior Employee Relations Officer, informed Dr. Clemmons that an investigation would be commenced. *See* Clemmons Dep. 345:13-18. Ms. McClintock interviewed Dr. Clemmons by phone on October 14, 2008, after which Dr. Clemmons sent her a set of emails and documents that she believed addressed the key points of the grievance. *See* Def.'s Mot. Summ. J., Ex. O-8. Separately, Ms. McClintock interviewed Ms. Mayo, Mr. Beadle De Palomo, and Ms. Nachbar. *See* McClintock Dep. 20:20-21:10. Ms. McClintock did not interview Ms. Larsen, though she did confirm with Ms. Nachbar that Ms. Larsen had been counselled about remaining professional when working with Dr. Clemmons. *See* Def.'s Mot. Summ. J., Ex. O-28.

On December 23, 2008, Dr. Clemmons informed Ms. McClintock that she was seeking legal advice due to concerns about having her professional reputation and employment opportunities harmed because of her conflict at AED, as well as the potential fall-out with USAID in Ghana. *See* Def.'s Mot. Summ. J., Ex. O-26. On January 7, 2009, Ms. McClintock sent Dr. Clemmons a "final close-out" report setting forth the findings from the investigation, including that:

> I did not find a collaborative or collective effort to have you terminated, and/or a campaign against you. However, I did find inappropriate behavior and actions to have taken place in the past. The people who were involved with such actions have been formally addressed, very clearly and directly. As a result, it is our expectation that you will not experience similar actions to take place in the future. However, if that is not the case, you are asked to inform HR[.]

*Id.* at Ex. O-134. On February 15, 2009, Dr. Clemmons emailed Ms. McClintock about several lingering issues she had regarding alleged racially-motivated workplace mobbing. *See id.* at Ex. O-29. In response, Ms. McClintock asked Dr. Clemmons to provide more details about these incidents, *see id.*, but Dr. Clemmons never replied to Ms. McClintock, *see* McClintock Dep. 218:12-14.

Instead, on February 25, 2009, Dr. Clemmons sent Mr. Villeta a series of emails detailing her concerns about AED's investigation into her grievance and asking for a hearing before AED's Grievance Board. *See* Def.'s Mot. Summ. J., at Ex. O-168. Mr. Villeta responded with an email explaining why he thought the investigation was sufficient. *See id.* at Ex. O-136. Mr. Villeta also stated, however, that Dr. Clemmons could convene the Grievance Board if she desired, *see id.*, but Dr. Clemmons deleted the email before fully reading it, so she was unaware of this option. *See* Clemmons Dep. 432:21-433:3. Dr. Clemmons resigned on March 9, 2009. *See* SOF ¶¶ 168, 170-71.

### F.  The Request for Paid Leave

On December 2, 2008, Dr. Clemmons emailed Ms. Mayo to request an advance of fourteen days of paid Rest & Recuperation ("R&R") leave beginning in January 2009. *See id.* ¶ 138. At the time, Dr. Clemmons had a negative vacation balance that would return to a zero balance at the end of the next pay period. *See* Def.'s Mot. Summ. J., Ex. O-86. Despite this, Mr. Dan White, the Senior Financial Director of COACH, advanced her five days of vacation leave and one day of personal leave, which is the amount Dr. Clemmons would have accrued in the first quarter of the next year. *See id.*

### G.  Alleged Reputational Harm

Dr. Clemmons asserts that after resigning, she learned additional information about AED's alleged attempts to damage her reputation. Specifically, she alleges that staff at the COACH Center in Washington, D.C. labeled her a "black prima donna," SAC ¶ 101, and that Mary Lyn Field, then an AED Vice President, told a senior manager with Family Health International that there were "management problems" within SHARP and implied that Dr. Clemmons was "a problem for AED," Clemmons Dep. 32:6-13. Further, in February 2009 Ms. Field allegedly approached a group of development specialists on their way to an HIV/AIDS conference, including a senior manager with John Snow International ("JSI") who had worked with Dr. Clemmons in Uganda, and asked in an insinuating tone whether Dr. Clemmons was "difficult" at her last job. *See id.* 46:4-48:21. Dr. Clemmons also asserts that Mr. Niblett, a senior officer at AED with whom she had never worked, said to an employee of another non-governmental organization that Dr. Clemmons was "not a team player." *Id.* 65:13-67:15. Dr. Clemmons speculated that Mr. Niblett formed this opinion after reading Ms. Nachbar's July 2008 email recommending that AED fire Dr. Clemmons. *See id.* at 70:16-72:4.

Dr. Clemmons, moreover, argues that she lost job opportunities due to her damaged reputation. In particular, she asserts that while in Ghana in May 2009, JSI offered to include her in a grant proposal as the chief of party/project director for a new USAID-funded project, but the offer was withdrawn shortly thereafter. *See id.* 87:1-90:10. Dr. Clemmons further alleges that JSI's Ken Olivola said she was removed from consideration for this project due to reports that she was "difficult to work with" and "hard on Ghanaian staff." Pl.'s Interrog. Resp. No. 9 at 19, Ex. O-111, ECF No. 56-19. Finally, Dr. Clemmons asserts that she was qualified for several other positions within USAID for which she applied, but she was denied these positions because of negative comments about her work with SHARP. *See* Clemmons Decl. ¶ 10, Jan. 31, 2014, ECF No. 67.

### III.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and [thus] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When Rule 56 is invoked, the moving party has the initial burden of demonstrating the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party does not bear the burden of persuasion at trial, its burden "may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, to defeat the motion the nonmoving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (citation omitted). Although the Court must view this evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *see Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23-24 (D.C. Cir. 2013), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his position — "there must be evidence on which the jury could reasonably find for [the nonmoving party]." *Anderson*, 477 U.S. at 252. Moreover, the nonmoving party "may not rest upon mere allegation or denials of his pleading but must present affirmative evidence showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (internal quotation marks and citation omitted).

Finally, the Court notes that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (citation omitted). Indeed, a court's role in deciding a summary judgment motion is not to "determine the truth of the matter, but instead [to] decide only whether there is a genuine issue for trial." *Id.* (citation omitted).

## IV. ANALYSIS

Dr. Clemmons brings causes of action against AED under Title VII and the DCHRA for constructive discharge, retaliation, and hostile work environment on the basis of racial discrimination, as well as a cause of action for defamation under District of Columbia common law and a claim asking the Court to order adverse inferences based on spoliation of evidence.

AED has moved for summary judgment on all of Dr. Clemmons's claims. For the reasons

explained below, the Court grants AED's motion for summary judgment as to each issue.

## A. Title VII and DCHRA Claims

Dr. Clemmons asserts multiple claims under both the DCHRA and Title VII. The

DCHRA, just like Title VII, prohibits certain discriminatory practices "[b]y an employer,"

including making it unlawful for an employer to "fail or refuse to hire, or to discharge, any

individual; or otherwise discriminate against any individual, with respect to his compensation,

terms, conditions, or privileges of employment" based upon several protected categories,

including "race, color, religion, national origin, sex [or] age."[2] D.C. Code § 2-1402.11(a)(1).

Given the similarities between the statutes, it is not surprising that the D.C. Court of

Appeals "has made clear that federal case law addressing questions arising in Title VII cases is

applicable to the resolution of analogous issues raised regarding DCHRA claims." *Ali v. District

of Columbia*, 697 F. Supp. 2d 88, 92 n.6 (D.D.C. 2010) (citing *Howard Univ. v. Green*, 652 A.2d

41, 45 & n.3 (D.C. 1994)); *see also, e.g.*, *Regan v. Grill Concepts-D.C., Inc.*, 338 F. Supp. 2d

131, 134 (D.D.C. 2004) ("This Court, too, will consider [p]laintiff's claims under [the DCHRA]

utilizing the case law developed for suits brought under Title VII."); *MacIntosh v. Bldg. Owners

& Mgrs. Ass'n Int'l*, 310 F. Supp. 2d 240, 244 (D.D.C. 2004) (noting that in analyzing a claim of

employment discrimination under the DCHRA, this Court looks to Title VII jurisprudence).

Further, "in considering claims of discrimination under the DCHRA, [courts] employ the

same three-part, burden-shifting test articulated by the Supreme Court for Title VII cases in

---

[2]     The DCHRA is broader than Title VII insofar as it prohibits discrimination based
on the "race, color, religion, national origin, sex, age, marital status, personal appearance, sexual
orientation, gender identity or expression, family responsibilities, genetic information, disability,
matriculation, or political affiliation of any individual," whereas Title VII prohibits
discrimination only with respect to an individual's "race, color, religion, sex, or national origin."
*Compare* D.C. Code § 2-1402.11(a)(1), *with* 42 U.S.C. § 2000e-2(a)(1).

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)." *Hollins v. Fed. Nat. Mortg.*

*Ass'n*, 760 A.2d 563, 571 (D.C. 2000); *see also McFarland v. George Wash. Univ.*, 935 A.2d

337, 346 (D.C. 2007); *Atlantic Richfield Co. v. District of Columbia Comm'n on Human Rights*,

515 A.2d 1095, 1099 (D.C. 1986). Thus, because Dr. Clemmons alleges the same facts and

violations under both Title VII and the DCHRA, and because both statutes apply the same legal

standard and burden-shifting framework, the Court will analyze the claims simultaneously.

> 1. Hostile Work Environment under Title VII and the DCHRA

Dr. Clemmons alleges that until her resignation, she experienced a hostile work

environment based on racial discrimination through "workplace mobbing" that occurred in the

following ways: Director of GHPN, Margaret Parlato, falsely spreading rumors about her, then

telling AED's Mr. Niblett that Dr. Clemmons had denounced GSCP to USAID; GSCP

consistently reporting to AED's headquarters that Dr. Clemmons was "disingenuous and

manipulative"; Ms. Moskov falsely informing another USAID office that Dr. Clemmons had a

tendency to "cry racism"; Ms. Nachbar sending an email falsely detailing Dr. Clemmons's

unprofessional conduct at a joint GSCP/SHARP meeting and calling for Dr. Clemmons's

termination; Ms. Larsen, Ms. McCown, and Ms. Moskov ridiculing and glaring at Dr. Clemmons

during meetings; Dr. Clemmons being forced to report directly to Ms. Nachbar during the

harassment investigation; and AED taking insufficient steps to address the hostile work

environment by refusing to send Dr. Clemmons's allegations to a non-management majority on

the Grievance Board. *See* Pl.'s Opp'n to Def. AED's Mot. for Summ. J., 15-18, Jan. 31, 2014,

ECF No. 67.

To establish a prima facie hostile work environment claim under Title VII and the

DCHRA, Dr. Clemmons must demonstrate that (1) she is a member of a protected class; (2) she

was subject to unwelcome harassment; (3) the harassment occurred because of her race; and (4) the harassment affected a term, condition, or privilege of employment. *See Singletary v. District of Columbia*, 225 F. Supp. 2d 43, 62 (D.D.C. 2002); *Kelley v. Billington*, 370 F. Supp. 2d 151, 156 (D.D.C. 2005); *see also Elam v. Bd. of Trs.*, 530 F. Supp. 2d 4, 22 n.7 (D.D.C. 2007) ("The elements of a hostile work environment claim under the DCHRA mirror the federal requirements." (citing *Lively v. Flexible Packaging Assoc.*, 830 A.2d 874, 889 (D.C. 2003))). For the reasons explained below, the Court finds that Dr. Clemmons has failed to establish the facts necessary for maintaining a hostile work environment claim.

### a. Racial Discrimination

Under Title VII and the DCHRA, a "plaintiff must always prove that the conduct at issue was not merely tinged with offensive … connotations, but actually constituted discrimination … because of the employee's protected status." *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 188-89 (D.D.C. 2012) (citation and quotation marks omitted; alteration in original); *Bryant v. Brownlee*, 265 F. Supp. 2d 52, 63 (D.D.C. 2003) (noting that for a hostile work environment claim, plaintiff "must produce evidence that she was discriminated against because of her [status]" (citation and quotation marks omitted)). "It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination." *Id.* (citing *Lewis v. District of Columbia*, 653 F. Supp. 2d 64, 80 (D.D.C. 2009)). But, on the other hand, even statements "containing no overt references to the individual's race, can, in a broader context, be plainly understood expressions of racial hostility." *Na'im v. Clinton*, 626 F. Supp. 2d 63, 74 (D.D.C. 2009).

Here, the acts upon which Dr. Clemmons rests her hostile work environment claim do not involve explicit references to race. Instead, she points to the following circumstantial evidence to

demonstrate racial discrimination: Ms. Larsen, a white woman, receiving a higher starting salary than Dr. Clemmons, even though Dr. Clemmons had more experience; Ms. Larsen likening Dr. Clemmons to a "dog … that won't let go of a bone," Pl. Interrog. Resp., No 3-2 at 11, Ex. O-111; Ms. Larsen and Ms. McCown treating "white colleagues or African Ghanaian colleagues" of a junior status with respect and friendliness, but being hostile and derisive towards Dr. Clemmons, Clemmons Dep. 124:15-22; and supervisors believing that GHPN's treatment of Dr. Clemmons was motivated by her race. Thus, Dr. Clemmons argues that her experience, combined with the experiences of other African-American colleagues, and the observations of Mr. Beadle De Palomo, show that race was a motivating, or at least exacerbating, factor in the workplace hostility she endured.

Dr. Clemmons first argues that she received a lower starting salary than Ms. Larsen despite Dr. Clemmons having more field experience. Dr. Clemmons then posits that this difference in pay was due to racial animus. Her argument fails, however, for a very simple reason: The individuals who Dr. Clemmons alleges are responsible for the "workplace mobbing" are not the people who determined Ms. Larsen's and Dr. Clemmons's salary. Instead, it is undisputed that the salaries were determined by Mr. Beadle De Palomo, Mr. Niblett, Chief Operating Officer Jack Downey, and President Steve Moseley. *See* Beadle De Palomo Dep. 31:10-32:9. Dr. Clemmons, on the other hand, attests that the workplace mobbing was carried out by some combination of Ms. Parlato, Ms. Moskov, Ms. Larsen, Ms. Nachbar, and Ms. McGowan. For this reason, the disparate starting salaries provide no insight into whether the accused individuals acted with racial motivations.

In addition, the Court notes that USAID did not authorize Dr. Clemmons's requested salary of $122,00, but rather approved a starting salary of $114,500. *See* SOF ¶ 14. In order to

hire Dr. Clemmons, AED agreed to pay the $7,500 difference. *See* Def.'s Mot. Summ. J., Ex. O-131, O-132; Beadle De Palomo Dep. 42:9-11. Accordingly, she received the exact salary she demanded at the expense of AED using its own funds, and AED's willingness to meet her original salary demand directly contradicts her claim that her salary was the result of racial discrimination.

Dr. Clemmons also asserts that Ms. Larsen said she was "just like a dog[,] … like a terrier that won't let go of a bone." *See* Pl. Interrog. Resp., No 3-2 at 11, Def.'s Mot. Summ. J., Ex. O-111. Though this statement lacks an explicit reference to race, it does constitute one incident within the broader conflict between Dr. Clemmons and Ms. Larsen. As such, the Court begins its analysis by reviewing the tumultuous relationship between the women before moving on to determine whether Dr. Clemmons has established racial discrimination.

Beginning in September 2007, AED adopted the JIP to increase SHARP's and GSCP's efficiency in developing and implementing communication strategies for HIV prevention in Ghana. *See* Clemmons Dep. 170:11-171:10; Moskov Dep. 66:17-67:15. The JIP required Dr. Clemmons and Ms. Larsen, as the COPs for SHARP and GSCP, respectively, to meet regularly and collaborate on tasks. Dr. Clemmons testifies that in a series of telephone calls, meetings, and emails leading up to one event, Ms. Larsen was "dismissive and resistant" to her ideas, eventually telling Dr. Clemmons that GSCP would not provide SHARP with support for the event. *See* Pl. Interrog. Resp., No 3-1 at 10-11, Def.'s Mot. Summ. J., Ex. O-111. As another example, when Dr. Clemmons provided technical feedback on materials generated by GSCP that required SHARP's approval, Ms. Larsen interrupted Dr. Clemmons while she was speaking and told Dr. Clemmons that she always had to be right about everything. *See id.* at No. 3-5. Ms. Larsen allegedly went on to say, in a snide tone, that "this is exactly the reaction that I would

expect from you, Lydia, and I am not at all surprised." *Id.* Dr. Clemmons further alleges that Ms. Larsen behaved similarly in each JIP meeting, and as such, she would "consistently talk over … interrupt, or speak to [Dr. Clemmons] in a condescending way, and generally give the impression that she considered [Dr. Clemmons's] inputs to be irritating or of no value." *Id.* at No. 3-7.

Dr. Clemmons contends that supervisors who witnessed these and other similar interactions between the women believed that GSCP's conduct was motivated by racial discrimination. *See* Pl.'s Opp'n, 21-22. To this point, Dr. Clemmons identifies a set of statements made by Mr. Beadle De Palomo and Ms. Mayo. *Id.* First, in a conversation between the two about the tension between Dr. Clemmons and Ms. Larsen, Ms. Mayo claims that Mr. Beadle De Palomo said that Dr. Clemmons "has a lot of experience and has a commanding presence. She looks like Vanessa Williams and intimidates the dowdy, white women of the Ghana Sustainable Change Project." *See* Mayo Dep. 89:13-17. Ms. Mayo suggests that Mr. Beadle De Palomo was implying that race or cultural issues contributed to the issues between the projects. *Id.* at 87:6-9.

Mr. Beadle De Palomo, however, denies that this statement was intended to suggest racial tension, *see* Beadle De Palomo Dep. 189:1-191:7, but rather that he only intended to describe Dr. Clemmons's energy and ability to captivate a room. *See id.* at 189:9-12. In fact, Ms. Mayo separately notes that the comment was more descriptive in nature, as indicated by the use of "Vanessa Williams" "as a point of reference." Mayo Dep. 89:13-20. Thus, though Ms. Mayo at one point states in her deposition that she inferred racial animus from Mr. Beadle De Palomo's juxtaposition of Dr. Clemmons as "Vanessa Williams" and the GSCP staff as "dowdy white women," *see* Mayo Dep. 93:15-20, Ms. Mayo later testifies that the descriptors may have been

related to Dr. Clemmons's and the GSCP staff's personal appearance and attractiveness, rather than race, *see* Mayo Dep. 97:9-98:22.[3]

Dr. Clemmons also argues that Ms. Mayo's own perception of the tension between Dr. Clemmons and the GSCP staff suggests that racial discrimination occurred. Indeed, Ms. Mayo testifies that "GSCP had a stereotype of Dr. Clemmons as a menacing, attacking black woman." Mayo Dep. 252:15-254:3. Ms. Mayo formed this belief through her discussions with Mr. Beadle De Palomo, her personal experience as an African-American woman, and her observations of Dr. Clemmons interacting with the GSCP team. *See generally*, Mayo Dep. 257-265. Ms. Mayo therefore at times suggests that GSCP's reaction to Dr. Clemmons was informed by prejudice and preconceptions about African-Americans. *See* Mayo Dep. 256:17-259:21. Ms. Mayo also admits, however, that GSCP staff never explicitly described Dr. Clemmons as a "menacing black woman." *Id.* at 255:14-255:1. She also acknowledges that some of the incidents between Dr. Clemmons and GSCP resulted from personality conflicts, not race. *See* Mayo Dep. 182:2-12. Thus, Ms. Mayo attempts to present a narrative in which Ms. Larsen and Ms. McCown possessed stereotypes about African-American women that affected their opinion of Dr. Clemmons's workplace performance, despite her own statements that suggest otherwise.

AED, on the other hand, alleges a non-discriminatory justification for the conflict between Dr. Clemmons and GSCP: "intense internal competition" between the projects for the "attention and resources from AED and their mutual external client … USAID." Def.'s Mot. Summ. J., 1. According to Mr. Beadle De Palomo, the relationship between the groups "was never good," Beadle De Palomo Dep. 214:9-10, and he explains that the projects were "set up at the same time from the same organization, sort of similar scope…. The programs were

<hr />

[3]     Of course, personal appearance is protected under the DCHRA but not Title VII. *See* D.C. Code § 1-2501.

competing against each other, which in our field [] happens across organizations. It is very rare for one organization to be implementing dual multiple projects in the same space." *Id.* at 216:3-11.

Ms. Moskov echoes this assessment, explaining that the projects suffered from "inadequate communication and strategic misalignment" even before Dr. Clemmons and Ms. Larsen joined. Moskov Dep. 66. Indeed, several other managers note that tension between the projects predated Dr. Clemmons and Ms. Larsen arriving, *see, e.g.*, Mayo Dep. 70:13-19; McClintock Dep. 152:20-153:9; Nachbar Dep. 170:4-172:3; Beadle De Palomo Dep. 9:1-10:13, 213:22-215:20, and the strain only increased after implementation of the JIP, which required GSCP to provide "technical oversight" on projects that SHARP previously was implementing independently. *See* Moskov Dep. 68. Thus, as Ms. Moskov explains, "when GSCP was moving slow[ly] in their projects, SHARP was working more independently in the communication around HIV/AIDS. When GSCP['s] work started to improve … we asked them to take back or play the role they had originally been set up to play around HIV communication and that is when the tension grew." *Id.* Similarly, Ms. Nachbar describes the JIP as "ambitious," and she questions whether AED possessed the "resources to be able to do everything that was being asked and the volume of what was being asked in the time period we were talking about." Nachbar Dep. 40:11-18. Thus, AED's evidence demonstrates that the JIP was plagued by funding and structural issues from its inception, and it may have been these issues, not race, that caused the tension between the projects.

The story, then, is complicated. It is not entirely clear whether Dr. Clemmons experienced any race-based discrimination within the workplace, and in fact, the evidence strongly suggests that she did not. At the same time, AED has provided additional evidence

suggesting that tension between the projects existed before Dr. Clemmons joined and only increased as a result of the JIP, not because of racial discrimination. *Cf. Nichols v. Truscott*, 424 F. Supp. 2d 124, 140 (D.D.C. 2006) (rejecting Title VII claim when "[r]ather than arising from any discriminatory [or retaliatory] animus …, this harassment appears quite clearly to have arisen from personal conflicts between plaintiff and her … supervisors"); *see also Moses v. City of New York*, No. Civ. 06-5974, 2007 WL 2600859, at *1 (S.D.N.Y. Aug. 28, 2007) ("The anti-discrimination laws do not require defendants to be good managers; they require only that defendants do not discriminate on the basis of a protected status."). On the other hand, certain comments made about Dr. Clemmons hint at racial stereotypes playing a part in her workplace perception. Nonetheless, because the Court disposes of the Title VII and DCHRA claims on separate grounds, it is unnecessary to disentangle this web.

### b. *Severe or Pervasive Harassment*

The Supreme Court has held that Title VII, and thus the DCHRA as well, is violated only by harassment that is so "severe or pervasive" as to "alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998). "In order to be actionable under [Title VII], a[n] … objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.* at 787 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)). To determine whether an environment is objectively abusive, courts consider the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23; *Baloch Kempthorne*, 550 F.3d 1191,

1201 (D.C. Cir. 2008) (same). "[I]solated incidents … will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788. Indeed, the standard for maintaining a hostile work environment claim is sufficiently demanding to ensure that Title VII does not become a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). For the following reasons, the Court finds that Dr. Clemmons fails to meet this standard, and as such, her Title VII and DCHRA hostile work environment claims fail.

First, though Dr. Clemmons suggests that her reputation was damaged, the evidence shows that the relevant supervisors always maintained a positive impression of her work and career prospects. *See, e.g.*, Beadle De Palomo Dep. 144:13-145:18; 231:5-232:17. This reality was never more evident than through the events following the July 13, 2008, email from Ms. Nachbar to several supervisors recommending that Dr. Clemmons "be removed," or at least face consequences for her "out of control" actions. Mr. Beadle De Palomo responded that "[i]f this [email] is the smoking gun or evidence of Lydia's behavior being 'beyond the pale of acceptable professional behavior,' I am not all convinced." *Id.* at 129:19-130:2. Further, by the time Dr. Clemmons was aware of the email, Mr. Beadle De Palomo already had informed her that he was the only person who "could affect how she was treated in the organization," and that such treatment would be based on her performance ratings and professional success alone. *See id.* 232:5-11. Indeed, Mr. Beadle De Palomo testifies that his defense of Dr. Clemmons was so vigorous that it destroyed his previously friendly relationship with Ms. Nachbar. *See id.* 152:21-153:4. Given that Dr. Clemmons received clear reassurances that her job security and workplace reputation were intact, the evidence simply does not demonstrate that this email altered Dr. Clemmons's workplace condition in any way, let alone to a severe or pervasive degree.

The Court reaches the same conclusion as to Dr. Clemmons's complaints about GSCP staff sending rude emails, rolling their eyes at her in meetings, and allegedly spreading false rumors about her. Annoying as these behaviors may be, they are "purely subjective harms" that did not affect the "terms, conditions, or privileges of employment," and as such, they were not "adverse employment actions." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002); *see also Saba v. U.S. Dep't of Agric.*, No. CV 12-1036, 2014 WL 575891, at *5 (D.D.C. Feb. 14, 2014) (concluding that allegations of supervisors falsely accusing plaintiff of violating employer's leave policy and repeatedly calling him on his personal phone while on sick leave were "[a]nnoying" but did not amount to severe or pervasive conduct); *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 98 (D.D.C. 2007) (finding that five alleged acts of discrimination in two years, as well as additional "inappropriate comments" by a supervisor, were insufficient to constitute a hostile work environment); *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 54-57 (D.D.C. 2004) (finding that plaintiff's allegations that her employer humiliated her at important meetings, screamed at her one time, told her to "shut up and sit down" one time, and was "constantly hostile and hypercritical" did not amount to a hostile work environment).

As the D.C. Circuit has reiterated, "not everything that makes an employee unhappy is an actionable adverse action" because, otherwise, courts would become mediators for "even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like." *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (internal quotation marks and citations omitted). Indeed, this Court has rejected hostile work environment claims under similar situations in which "none of the instances alleged amount to objective harm with tangible workplace consequences." *Morrison v. Mills*, 928 F. Supp. 2d 241, 249-250 (D.D.C. 2013) (finding no hostile work

environment when plaintiff was excluded from team meetings, not given files necessary to complete assignment, and was generally treated with disrespect within the workplace). Again, Dr. Clemmons provides no evidence of any *tangible* consequence to her employment conditions, but rather only a discrete set of events that "though annoying and inconvenient, do not constitute materially adverse action." *Lewis v. District of Columbia*, 885 F. Supp. 2d 421, 428 (D.D.C. 2012) (citation and quotation omitted). Accordingly, the Court concludes that there is no genuine dispute of material fact that the events Dr. Clemmons endured were not sufficiently severe or pervasive to establish a hostile work environment claim.[4] The Court therefore grants summary judgment for AED.

## 2. Retaliation under Title VII and the DCHRA

Dr. Clemmons also asserts that she was retaliated against for engaging in a protected activity, namely reporting racial harassment to AED's Human Resources Department. *See* Pl.'s Am. Compl. ¶ 139-40. Title VII's anti-retaliation provision prohibits an employer from discriminating against an employee because the employee "'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Manuel v. Potter*, 685 F. Supp. 2d 46, 65 (D.D.C. 2010) (citing 42 U.S.C. §2000e-3(a); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). To establish a prima facie case of retaliation, Dr. Clemmons must demonstrate that she engaged in a

---

[4]     AED also argues that Dr. Clemmons is unable to show that it negligently failed to take action to prevent the workplace mobbing, and thus is unable to establish vicarious liability for the hostile work environment claim. *See* Def.'s Mot. Summ. J. 2. The Court does not need to reach this issue, however, because it finds that the hostile acts are not sufficiently severe or pervasive to create a hostile work environment in the first place.

protected activity and that her employer took materially adverse action against her because she engaged in that activity.[5] *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013).

Dr. Clemmons may meet her burden through direct evidence, or if she cannot produce direct evidence of retaliation, through the three-part burden-shifting framework laid out in *McDonnell-Douglas Corp v. Green*, 411 U.S. 792 (1973). Under this framework, she must initially prove her prima facie case by a preponderance of the evidence. *Id.* at 802. If she is successful in making this prima facie showing, the burden of production shifts to the employer, which must articulate a legitimate, non-retaliatory reason for its action. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). At the final step, Dr. Clemmons must prove that the employer's proffered explanation is a pretext masking prohibited retaliation. *See id.* at 256.

The D.C. Circuit has explained, moreover, that when an employer has proffered a legitimate, non-retaliatory explanation for the adverse action, "the burden-shifting framework disappears," *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009), and the central question before the court is "whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted [non-retaliatory] reason was not the actual reason and that the employer intentionally [retaliated] against the employee in violation of Title VII." *McGrath v. Clinton*, 666 F.3d 1377, 1383 (D.C. Cir. 2012) (alterations in original) (quotations omitted).

AED argues that Dr. Clemmons has not identified a materially adverse action that occurred as the product of AED's alleged retaliation. *See* Def.'s Opp'n. at 25. The "material adversity" requirement emphasizes that district courts should distinguish between "trivial" harms and "significant" harms that arise in the workplace. *See Burlington*, 548 U.S. at 68. Thus, to

---

[5]       AED argues that Dr. Clemmons was not opposing a discriminatory practice prior to the alleged retaliatory action because her "mobbing grievance" did not even hint at racial harassment. But because the Court rules on other grounds, it does not reach this issue.

demonstrate material adversity, Dr. Clemmons must show that "a reasonable employee would have found the challenged activity materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (quotations omitted). Of course, "Title VII … does not set forth a general civility code for the American workplace," or immunize employees "from those petty slights or minor annoyances that often take place at work." *Id.* (quotations omitted). To distinguish between trivial harms and materially adverse actions, courts must examine the "particular circumstances" and context of each case to determine whether the employer's action would deter a reasonable employee from complaining about discrimination. *See id.* at 69.

Here, Dr. Clemmons first alleges that she was threatened with a poor review in retaliation for her complaint to Human Resources. This allegation is based on Mr. Beadle De Palomo's statement that he did "not support [Dr. Clemmons] taking [her complaint] to HR." Def.'s Mot. Summ. J., Ex. O-78. The Court notes, however, that this remark was not actually a clear threat that if Dr. Clemmons filed a grievance, Mr. Beadle De Palomo would give her a bad review. Indeed, the remainder of the email makes clear that Mr. Beadle De Palomo really had in mind the possibility that pursuing a grievance would consume Dr. Clemmons's time, which, in turn, would make her less productive, thereby negatively impacting her performance and possibly resulting in a lower review. *See id.*; *see also Gaujacq v. EDF, Inc.*, 601 F.3d 565, 578 (D.C. Cir. 2010) ("A statement that literally appears to be threatening is not necessarily a materially adverse action. An employer's words and other actions must be considered in context . . . ."). In context, a reasonable employee in Dr. Clemmons's position would have understood Mr. Beadle De Palomo's comment as a reflection of personal views and professional advice, and not as a threat of retaliation. *Cf. Guajacq*, 601 F.3d at 579 (holding that a reasonable worker would have

understood the statement "your career is dead . . . if you file the claim" in the context of the discussion to be an expression of exasperation rather than a threat of retaliation so that it did not constitute a materially adverse action).

Yet even construing this language — which the Court finds to be ambiguous — as a possible threat of adverse action, it is clear that the potential threat never materialized. Dr. Clemmons did, in fact, file a grievance on October 7, 2008, but it did not impact her performance evaluation later that month.  Dr. Clemmons's October 20, 2008 performance evaluation, like her previous two, rates her performance as "Excellent," the highest possible designation. Def.'s Mot. Summ. J., at Exs. 90, 140, 213.  Dr. Clemmons has thus failed to show that Mr. Beadle De Palomo's statement indicating his lack of support for her complaint, which lacked any corresponding consequences, was materially adverse.  *See Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (holding that proposed suspensions were not materially adverse actions where the suspensions were never served); *Russell v. Principi*, 257 F.3d 815, 819-20 (D.C. Cir. 2001) (holding that "an unrealized risk of a future adverse action [in the form of a reduction in force], even if formalized, is too ephemeral to constitute an adverse employment action").

Second, Dr. Clemmons argues that receiving the lowest available salary increase in 2008 after filing her grievance constituted a materially adverse action. It is well settled that under Title VII — and thus the DCHRA, too — an action is materially adverse when it constitutes a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Bridgeforth,* 721 F.3d at 663 (characterizing such typical materially adverse actions as demonstrating an "objectively tangible harm"). Although a less obvious harm may also qualify

as a materially adverse action, it "must not be 'unduly speculative.'" *Id.* (quoting *Douglas v. Donovan*, 559 F.3d 549, 553 (D.C.Cir.2009)).

Here, Dr. Clemmons does not complain that she received *no* pay increase (let alone a pay *decrease*); rather, she takes issue with having received a pay increase of 4.5%, the minimum percentage increase within the AED salary guidelines range for the highest-rated employees. *See* Def.'s Mot. Summ. J., at Ex. O-88. Of course, a lower than expected raise or bonus could theoretically constitute a materially adverse action if the decreased compensation is awarded for discriminatory or retaliatory reasons. *See Russell*, 257 F.3d at 224 (holding that "loss of a bonus can constitute an adverse employment action under Title VII"); *Nurriddin v. Bolden*, No. 04-cv-2052, 2014 WL 1648517 (D.D.C. Apr. 25, 2014) (assuming without deciding that "receipt of an $800 award, rather than a larger amount," represents an adverse action because it affected the plaintiff's compensation); *but see McCann v. Fairfax County Gov't*, 32 F. Supp. 2d 365, 368 (E.D. Va. 1998) ("A pay increase obviously is a benefit, not an adverse action.").

Even assuming that the sub-optimal pay raise is materially adverse, however, AED has asserted legitimate, non-discriminatory reasons for the amount of the pay increase, and Dr. Clemmons has not produced sufficient evidence to discredit those legitimate reasons and show that the raise was retaliatory. Mr. Beadle De Palomo, who determined Dr. Clemmons's pay raise, testified that although AED guidelines allowed him to award Dr. Clemmons a salary increase of between 4.5% and 6.0% in 2008, his practice was to be frugal when setting raises for high-earning managers due to budgetary restrictions. *See* Def.'s Mot. Summ. J., at Ex. O-88; Beadle De Palomo Dep. 237:11-238:2, 244:7-254:9. Specifically, he adopted this approach because AED pays salary increases out of a common pool of funds, and as such, a larger salary increase for one high-earning manager, like Dr. Clemmons, results in fewer funds available for

lower-earning employees. *See* Beadle De Palomo Dep. 237:11-238:2, 244:7-254:9. Accordingly, other high-performing COPs also received minimum-level pay raises in 2008, including Stanley Terrell, a Caucasian COP for a project in the Dominican Republic, and Licida Bautista, a Latina COP for a project in Honduras. *See* Def.'s Mot. Summ. J., at Ex. O-88; O-211; O-212.

In response, Dr. Clemmons has not offered any evidence to demonstrate that AED's legitimate explanation is mere pretext or to support her theory of retaliatory animus. A plaintiff can show pretext "either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C.Cir.2009) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)). Here, Dr. Clemmons shows neither. She does not, for example, point to another similarly situated employee of the same pay grade who did *not* receive the minimum salary increase in 2008, nor does she offer evidence to contradict AED's asserted rationale. Instead, she simply points out that she received a mid-level pay increase in 2007, and that a jury could infer retaliatory intent based on the low-level raise in 2008 occurring within months of her making a complaint. *See* Pl.'s Opp'n at 29-30. While close temporal proximity can support an inference of causation sufficient to make out a prima facie case of retaliation, "positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine." *Hamilton v. Geithner*, 666 F.3d 1344, 1359 (D.C. Cir. 2012) (quoting *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C.Cir.2007)). Moreover, Dr. Clemmons's assertion that she received a higher raise in 2007 before she filed her grievance ignores the fact that her 2006 pay increase was – like her 2008 raise -- the minimum percentage increase permitted under AED guidelines that year. *See* Def.'s Mot. Summ. J., Ex. O-88, O-139, O-213. Because she has failed to overcome AED's legitimate, non-retaliatory

explanation for the amount of her 2008 pay increase, Dr. Clemmons's argument for retaliation based on the amount of her raise must also fail.

Third, Dr. Clemmons alleges that Mr. Beadle De Palomo retaliated by denying her request for fourteen days of R&R, but, critically, she fails to square this argument with the undisputed fact that she was not entitled to *any* days of R&R at the time of the request. *See* Clemmons Dep. 398:6-399:19. Despite not being entitled to a single day of R&R, Dan White, the Senior Financial Director of COACH, still recommended, and Mr. Beadle De Palomo approved, that Dr. Clemmons receive an advance of six days of paid leave, which was equal to the leave she would have accrued during the first quarter of the next year. *See* Def.'s Mot. Summ. J., Ex. O-86.

Dr. Clemmons also asserts that Ms. Mayo originally approved her request for fourteen days of R&R, but Mr. Beadle De Palomo reversed that decision without explanation. *See* Clemmons Dep. 417:11-14. In addition, Dr. Clemmons suggests that it was unusual for a senior VP like Mr. Beadle De Palomo to intervene in discretionary leave requests. *See id.* at 417:15-22. Dr. Clemmons, however, offers no evidence to support this claim besides her own self-serving, conclusory statements uncorroborated by any evidence. [6] *See Saunders v. DiMario*, No. Civ. 97-1002, 1998 WL 525798 at *4 (D.D.C. Aug. 14, 1998) ("Plaintiff has otherwise offered the type of self-serving allegations that are simply insufficient to establish pretext."). Ms. Mayo, moreover, appears to contradict Dr. Clemmons's claim by testifying that she had no authority to

---

[6]     Indeed, Dr. Clemmons fails to identify another similarly situated employee for whom this "case-by-case" leave policy was applied more leniently. To the contrary, Mr. Beadle De Palomo testifies that he never approved advanced leave to an employee with a negative leave balance, and Mr. Clemmons does not provide conflicting evidence to create a dispute of material fact on the issue. *See* Beadle De Palomo Dep. 249:19-22.

advance leave to employees with a negative balance, *see* Mayo Dep. 298:7-10, and that she

agreed with Mr. White's final recommendation of six days of paid leave, *see id.* 304:8-12.[7]

Even if the denial of vacation days that an employee has not accrued could constitute

materially adverse action, *see Morales v. Gotbaum*, 10-cv-0221, 2014 WL 2031244, at \*19

(D.D.C. May 19, 2014) (questioning whether the denial of advanced sick leave could constitute

an adverse action where unaccompanied by an allegation of financial harm); *see also Martin v.*

*Stericycle, Inc.*, 389 F. Supp. 2d 131, 136 (D. Ma. 2005) (finding that denial of vacation time to

plaintiff who had not yet accrued the time did not constitute an adverse employment action

because plaintiff could not prove that "any privilege or right to which she was entitled was

'taken' or 'withheld' from her"); *Paniagua v. Texas Dep't of Criminal Justice*, No. Civ. 99-2681,

2001 WL 540908, at \*6 (N.D. Tex. May 18, 2001) (finding no adverse employment action in

denial of vacation leave at a specific time because that decision did not deny plaintiff an equal

opportunity to redeem the vacation leave later), the fact that Dr. Clemmons received six days of

paid leave — which itself was a luxury — rather than fourteen days is certainly insufficient to

maintain a retaliation claim when she was entitled to zero days in the first place and there is no

evidence that anyone else received more under those circumstances.  Dr. Clemmons has offered

no evidence to suggest that the denial of unearned vacation days in accordance with AED policy

was anything other than legitimate and non-retaliatory, and accordingly, her vacation-related

claim must also fail.

---

[7]    Dr. Clemmons also cites to an email exchange that appears to clearly show Mr.
White recommending that AED advance her six days of paid leave, instead of eleven days. *See*
Def.'s Mot. to Dismiss, Ex. O-87. This email demonstrates that she specifically was advanced
six days, and not any other quantity of days, because that was the amount of leave she would
accrue by the end of the first quarter of 2009. *See id.* This further suggests a non-retaliatory
purpose behind the decision.    And Dr. Clemmons points to no evidence that Mr. White
possessed any retaliatory animus against her.

Fourth, Dr. Clemmons argues that AED forcing her to report to Ms. Nachbar regarding USAID's $500,000 grant for implementing an HIV-prevention program constituted a materially adverse employment action because it was "an invitation to more trouble."[8] Pl.'s Opp'n at 29. In particular, she alleges the HIV-prevention program required stricter reporting obligations for spending grant money than SHARP had to deal with for other grants that were "30 times" larger than the USAID grant, and as such, the reporting requirement was merely intended to create "busy work." *See id.*

It is well settled, however, that "minor inconvenience[s] and alteration[s] of job responsibilities … do not rise to the level of an adverse action." *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (internal quotation marks omitted); *see also Stewart v. Evans*, 275 F.3d 1126, 1135 (D.C.Cir.2002) (finding that the requirement that an employee provide bi-weekly updates on the status of her work did not rise to the level of adverse action necessary to support a [retaliation] claim); *Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007) (finding that a four minute decrease in airtime production was not materially adverse because it did not affect plaintiff's compensation, grade, or opportunity for career advancement). Here, Dr. Clemmons, in an email exchange with GSCP, stated that the new reporting rule required only a "10 minute effort." *See* Email between Clemmons and Torrance, Def.'s Mot. to Dismiss, Ex. O-82. In addition, AED simplified the process for Dr. Clemmons by creating a template and shifting some obligations from monthly to quarterly reports, and AED did not require Dr. Clemmons to submit updates for each deliverable, which allowed her to leave spaces blank in the template, further simplifying the process. *See id.* And as more evidence that the reporting requirement was nothing

---

[8]     This reporting required little, if any, direct contact with Ms. Nachbar. Instead, Dr. Clemmons was asked to provide a progress report to Senior Program Manager Sarah Torrance, who summarized the report and sent it to Ms. Nachbar for review. *See* Mayo Dep. 199:21-200:5; Email between Clemmons and Torrance, Def.'s Mot to Dismiss, Ex. O-82.

more than a minor inconvenience at most, many of Dr. Clemmons's reporting obligations were outsourced to local consultants, so she was not actually required to perform some of the tasks herself. *See id.* For these reasons, the Court again rejects Dr. Clemmons's argument that she suffered a materially adverse action. Accordingly, without evidence of a single qualifying materially adverse action other than perhaps the 2008 pay raise – for which Dr. Clemmons failed to demonstrate that AED's non-retaliatory rationale was mere pretext -- the Court grants summary judgment for AED on this claim.

### 3. Constructive Discharge under Title VII and the DCHRA

Finally, Dr. Clemmons brings a constructive discharge claim on the basis that AED left her in an untenable employment situation by failing to take actions to prevent the gossip and mobbing directed at her, and by threatening retaliation for complaining to Human Resources. *See* Pl.'s Am. Compl. ¶ 130. For a constructive discharge claim, Dr. Clemmons must show that (1) intentional discrimination existed; (2) her employer deliberately made working conditions intolerable; and (3) aggravating factors justified her conclusion that she had no option but to end the employment. *See Lewis v. District of Columbia*, 653 F. Supp. 2d. 64, 81 (D.D.C. 2009) (citing *Carter v. George Wash. Univ.*, 180 F. Supp. 2d 97, 110 (D.D.C. 2001)). Generally, resignations are presumed to be voluntary, and the "test for constructive discharge is an objective one: whether a reasonable person in the employee's position would have felt compelled to resign under the circumstances." *Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010); *see also Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006).

Further, to demonstrate constructive discharge based on a hostile work environment, Dr. Clemmons "must first establish a hostile work place by showing behavior 'sufficiently severe or pervasive to alter the conditions of [her] employment.'" *Boone v. MountainMade Found.*, No.

CV 08-1065, 2014 WL 4096477, at *17 (D.D.C. Aug. 20, 2014) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 133 (2004)). Dr. Clemmons "then must make an additional showing 'that the abusive working environment became so intolerable that her resignation qualified as a fitting response.'" *Id.* (quoting *Suders*, 542 U.S. at 133). Indeed, "the standard for constructive discharge is quite high," *Veitch*, 471 F.3d at 134, and constructive discharge "does not occur when an employee leaves an unpleasant but objectively tolerable job because alternatives have become more attractive, even if the employer's misbehavior creates the unpleasantness or … its largesse affirmatively increases the appeal of the employee's alternatives." *Taylor v. FDIC*, 132 F.3d 753, 766 (D.C. Cir. 1997).

The Court already has concluded that the alleged workplace harassment did not rise to the severe or pervasive level, which has been described as a lower standard than that which is required for constructive discharge. *See Suders*, 542 U.S. at 147-48 (holding that requirements for constructive discharge are more stringent than for a hostile work environment claim); *Mason v. Geithner*, 811 F. Supp. 2d 128, 206 (D.D.C. 2011) (concluding that because plaintiff "failed to make the lesser showing that he was subjected to a severe and pervasive hostile work environment, . . . it necessarily follows that his constructive discharge claim, which requires a more robust showing and rests on the same nucleus of factual allegations, must fail as well"); *McKeithan v. Boarman*, 803 F. Supp. 2d 63, 70 n.5 (D.D.C. 2011) ("[B]ecause [plaintiff] has failed to show that his working environment was hostile, he cannot establish that he was constructively discharged."). As such, the Court can grant summary judgment for AED on this basis alone.

Alternatively, even upon further review of Dr. Clemmons's arguments, the Court reaches the same conclusion. To start, Dr. Clemmons was never demoted, given a lower salary, or

otherwise stripped of responsibility within the workplace. Rather, she received excellent reviews from supervisors, *see* Clemmons Dep. 427: 1-6; Mayo Dep. 311:4-312:19, Beadle De Palomo Dep. 233:12-235:9, and she received a raise upon getting those reviews, *see* Clemmons Dep. 423:18-426:22; Beadle De Palomo Dep. 232:18-22. In addition, though Dr. Clemmons argues that she was constructively discharged by being "locked into a position from which she could apparently obtain no relief" after AED's Human Resources department allegedly failed to investigate her claims or grant her access to the Grievance Board, *see* Pl.'s Opp'n at 9, 31, Mr. Villeta's email about the investigation specifically stated that Dr. Clemmons *could* seek redress with the Grievance Board if she so desired, *see* Def.'s Mot. to Dismiss, Ex. O-136, at AED 00765-768. Though Dr. Clemmons says that she was unaware of this option because she prematurely deleted the email, her error does not change the reality of her failure to act on the available avenues for redress.

In fact, Dr. Clemmons remained at AED for several more months before leaving her position. *See* Clemmons Decl. ¶ 9. She even applied for a position with another organization that would have required her to continue working with GHPN. *See* Beadle De Palomo Dep. 252:12-22; Clemmons Dep. 446:1-5. And when Dr. Clemmons finally did leave, she said the reason for doing so was to "return to Vermont and spend some of the summer with [her] family" and to enjoy "some quality time for a real rest and relaxation with loved ones" — not because of an abusive or hostile work environment.[9] *See* Email from Clemmons to Mayo, Def.'s Mot. Summ. J., Ex. O-91. Taken together, the evidence simply does not suggest that Dr. Clemmons endured an environment "so intolerable that [s]he was left with no reasonable alternative other than

---

[9]     As further evidence undercutting her claim, this email and Dr. Clemmons's exit coincided with her project ending, and several other employees also were seeking new jobs around this time. *See* Mayo Dep. 342:5-10.

terminat[e] [her] employment." *Harris v. Wackenhut Servs., Inc.*, 590 F. Supp. 2d 54, 81 (D.D.C. 2008; *Douglas-Slade v. LaHood*, 793 F. Supp. 2d 82, 102-03 (D.D.C. 2011). As such, the Court grants summary judgment for AED.

## B. Defamation Claim under District of Columbia Common Law

Dr. Clemmons alleges that AED made false and defamatory statements that ruined her reputation in the International Health community and precluded her from receiving future job opportunities. Under District of Columbia law, Dr. Clemmons must establish the following elements to maintain a defamation claim: (1) the defendant made a false and defamatory statement concerning her; (2) the defendant published the statement without privilege to a third party; (3) the defendant's fault in publishing the statement amounted to at least negligence; and (4) either the statement was actionable as a matter of law irrespective of special harm, or the statement's publication caused special harm. *See Croixland Props. L.P. v. Corcoran*, 174 F.3d 213, 215 (D.C. Cir. 1999) (citing *Crowley v. N. Am. Telecomms. Ass'n*, 691 A.2d 1169, 1172 n.2 (D.C. 1997)).

Here, Dr. Clemmons alleges the following defamatory statements: (1) Jack Downey, CEO of AED, telling Mary Lynn Field-Nguer, Vice President and Director of the HIV/AIDS program, that Dr. Clemmons was "problematic," SOF ¶ 202, and Ms. Field-Nguer repeating this statement to Ms. Mayo and Ms. Bardfield, while adding that there were "management problems" at SHARP, SOF ¶¶ 203, 205; (2) Ms. Field-Nguer asking a senior manager at JSI whether Dr. Clemmons was "difficult" to work with at her last position, SOF ¶ 204; (3) VP Greg Niblett telling Ms. Bardfield that Dr. Clemmons was "not a team player," SOF ¶ 206; (4) Ms. Moskov, a USAID employee, sending an unsolicited reference to USAID's Tanzania office stating that Dr.

Clemmons tended to "cry racism when things are not going her way,"[10] SOF ¶ 211; and (5) a

USAID-funded project in Ghana reporting that it heard Dr. Clemmons was "difficult to work

with" and "hard on Ghanaian staff," SOF ¶ 216.

AED argues that Dr. Clemmons relies on inadmissible hearsay to prove the occurrence of

each of these allegedly defamatory statements. As with summary judgment generally, to survive

a motion for summary judgment on a defamation claim, Dr. Clemmons must provide evidence in

a form admissible at trial that shows that the defendant published the statements to a third party.

*See Poullard v. Smithkline Beecham Corp.*, No. Civ. 02-1590, 2005 WL 3244192 at *17-18

(D.D.C. Nov. 30, 2005). When information relied on by a plaintiff "is based on second or third-

hand statements, rather than personal knowledge,… such testimony consists of inadmissible

hearsay." *Id.* (citing Fed. R. Evid. 801(c)); *Wilkerson v. Wackenhut Protective Servs., Inc.*, 813

F. Supp. 2d 61, 67 (D.D.C. 2011) (explaining that personal belief, speculation, and hearsay are

insufficient to defeat a motion for summary judgment); *see also Marshall v. Allison*, 908 F.

Supp. 2d 186, 196 (D.D.C. 2012) (holding that plaintiff's testimony about a defamatory

statement made during a meeting at which plaintiff was not present constituted inadmissible

hearsay and therefore was insufficient to survive summary judgment).

Here, Dr. Clemmons concedes that she was not present during any of the alleged

defamatory remarks. *See* Clemmons Dep. 23:15-24:16; 46:9-49:7; 68:4-9; 90:4-92:12. Thus,

after admitting that she was not there when Ms. Field-Nguer allegedly told Ms. Bardfield that

"management problems" existed within SHARP, Dr. Clemmons testifies that Ms. Bardfield

relayed this information to her at a later time. *See id.* 23:15-24:16. Similarly, Dr. Clemmons

---

[10] The Court notes that this alleged defamatory remark was made by Ms. Moskov, an employee of USAID. Neither USAID nor Ms. Moskov is a party to this case, and Dr. Clemmons does not offer a theory of liability through which AED or FHI would be liable for the tortious conduct of Ms. Moskov.

admits that she was not present when Ms. Field-Nguer asked JSI's Katrina Khrum whether Dr. Clemmons was "difficult" in her last position.[11] *See id.* 46:9-49:7. The same holds true for Mr. Niblett's alleged comment about Dr. Clemmons not being a "team player." *See id.* 68:4-9. Finally, Dr. Clemmons admits that she cannot even identify who informed her about someone saying she was "difficult to work with" and "hard on Ghanaian staff," but rather she simply attributes these statements to "informal reports." *See id.* 90:4-92:12.

In response to AED's objection, Dr. Clemmons fails to address the hearsay question and instead mistakes AED's argument as one about the "common interest privilege." *See* Pl.'s Opp'n., at 35. The Court, however, feels compelled to note that there is direct evidence in the record stating that Ms. Field-Nguer implied that Dr. Clemmons's leadership had led to "management problems" at AED. *See* Bardfield Decl., Pl.'s Opp'n, Ex. C ¶ 3. But the Court finds no such direct evidence as to the other alleged defamatory comments, and without any legal or factual arguments from Dr. Clemmons to the contrary, the Court must conclude that the remaining statements, which are supported only through inadmissible hearsay, cannot survive summary judgment as the basis for the defamation claim.

Regarding Ms. Field-Nguer's comment, it merely expresses her subjective opinion, and under District of Columbia law, opinion statements that lend themselves to varying interpretations are insufficient for a defamation claim because they cannot be proved "false."[12] *Houlahan v. Freeman Wall Aiello*, No. 1:04-CV-1161, 2014 WL 545922, at *4 (D.D.C. Feb. 11,

---

[11]    In fact, Dr. Clemmons admits that she only heard this alleged statement from a third party who had spoken with Ms. Khrum, rather than from Ms. Khrum herself. *See* Clemmons Dep. 46:9-49:7.

[12]    Though it is unnecessary to evaluate the other alleged defamatory statements individually because Dr. Clemmons fails to support them with admissible evidence at summary judgment, the Court's independent analysis finds that such statements also likely would constitute opinions that are not actionable for defamation under District of Columbia law.

2014) ("'[S]tatements of opinion can be actionable if they imply a provably false fact, or rely upon stated facts that are provably false.'" (quoting *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000)). "[I]f it is plain that a speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Guilford Transp. Indus.*, 760 A.2d at 597 (internal quotations omitted).

Ms. Field-Nguer's alleged statement that Dr. Clemmons's leadership resulted in "management problems" clearly represents her own, unverifiable opinion. Further, Ms. Field-Nguer did not reference specific underlying incidents that could be "proven or disproven" in connection with this opinion statement.[13] *See Armstrong v. Thompson*, 80 A.3d 177, 188 (D.C. 2013) (finding that a co-worker's letter referring to plaintiff "as a liability" constituted an opinion that was not based on underlying facts that could be proven or disproven). As such, the Court grants summary judgment for AED on the defamation claim.

## C. Spoliation of Evidence Claim

Finally, Dr. Clemmons alleges that AED failed to preserve emails related to her grievance that potentially were relevant to this litigation. *See* Pl.'s Opp'n., at 37. "Spoliation" is

---

[13]     Separately, Dr. Clemmons suggests that this opinion was effectively a factual statement because it was uttered by an individual who acted as her supervisor and listeners therefore might attribute a sense of truthfulness to it. *See* Pl.'s Opp'n at 34. Though a speaker's identity may affect a listener's credibility determination, the speaker's knowledge about the opinion's subject, without more, does not convert an opinion into an actionable statement. *See, e.g.*, *Armstrong*, 80 A.3d at 188 (finding that a co-worker's characterization of plaintiff's misconduct as "serious integrity violations" and "gross misconduct" reflected that co-worker's "subjective view of the underlying conduct and [was] not verifiable as true or false"). Under Dr. Clemmons's theory, every opinion uttered by a supervisor would become a defamatory statement, even when the statement clearly is not "provably false." Such an outcome simply is not supported by the law. In addition, Dr. Clemmons does not point to evidence showing that the speaker in fact appealed to any expertise or knowledge when making the remark, which further undercuts her argument.

"defined as 'the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Clarke v. Wash. Metropolitan Area Transit Auth.*, 904 F. Supp. 2d 11, 20 (D.D.C. 2012) (quoting *D'Onofrio v. SFX Sports Grp., Inc.*, No. 06-687, 2010 WL 3324964, at *5 & n.5 (D.D.C. Aug. 24, 2010)). If spoliation occurs, an issue-related sanction, such as an adverse inference, is warranted only when (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defense of the party that sought it. *See Mazloum v. D.C. Metro. Police Dep't*, 530 F. Supp. 2d 282, 291 (D.D.C. 2008) (citations omitted).

Generally, spoliated evidence is considered relevant for "not only the ordinary meaning of the term, but also that the destroyed evidence would have been favorable to the movant." *Zhi Chen v. Dist. of Columbia*, 839 F. Supp. 2d 7, 14 (D.D.C. 2011). But even when evidence may be favorable to the movant, the adverse inference "must be sufficient to create a genuine issue of material fact" in order to avoid summary judgment. *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 28 (D.C. Cir. 2013).

Here, Dr. Clemmons seeks four issue-related adverse inferences against AED to fill in what she alleges are the following evidentiary gaps: (1) the lack of emails between Ms. Nachbar, Ms. Larsen, Ms. McCown, and Ms. Moskov, which Dr. Clemmons believes will demonstrate the conspiratorial relationship between the individuals when criticizing her; (2) the lack of certain emails between Mr. Beadle De Palomo and Ms. McClintock, which Dr. Clemmons believes will

show that AED willfully ignored race issues when handling the grievance; (3) the lack of all 457 alleged emails between SHARP and GSCP, which Dr. Clemmons believes were intentionally destroyed in order to hide meritless criticisms of her sent to Mr. Beadle De Palomo; and (4) the lack of any written communication from Mr. Beadle De Palomo to Messrs. Niblett and Downey about Ms. Nachbar's July 2008 email, which Dr. Clemmons believes will prove that Messrs. Niblett and Downey relied on the email when making negative comments about her. *See* Pl.'s Opp'n., 41-42. The Court finds, however, that even if granted, the adverse inferences that Dr. Clemmons seeks are insufficient to create the genuine disputes of material fact necessary to avoid summary judgment.

First, as to a possible adverse inference about the conspiratorial nature of the comments directed against Dr. Clemmons by Ms. Moskov, Ms. Nachbar, Ms. Larsen, and Ms. McCown, such an inference only would speak to the *subjective* mindset of these individuals, while the Court already dismissed the hostile work environment claim because the alleged *objective* acts were not sufficiently "severe" or "pervasive." *See infra* Part IV.A. Indeed, the alleged tormentors' subjective states of mind generally are irrelevant to maintaining the Title VII and DCHRA causes of action that Dr. Clemmons brings,[14] and as such, the requested adverse inference would not create a genuine dispute of material fact that prevents summary judgment.

Second, Dr. Clemmons seeks an inference that either Mr. Beadle De Palomo intentionally did not send the "public lynching email" to Mr. McClintock, or that Mr. McClintock negligently failed to read it. Pl.'s Opp'n at 41-42. She suggests that if granted, either inference would support

---

[14] Rather, it is the *victim's* subjective state of mind that counts. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) ("In order to be actionable under [Title VII], a[n] … objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that *the victim* in fact did perceive to be so." (emphasis added; citation omitted)).

her argument that AED willfully ignored race issues during the grievance investigation. *See id.* But in dismissing the constructive discharge claim, this Court did not rely on AED's purported willfulness or negligence in conducting the investigation, *see infra* Part IV. C, so any evidence or inference bolstering Dr. Clemmons's claim on this issue would be immaterial and thus would not allow her to avoid summary judgment.

Third, Dr. Clemmons requests an inference that AED intentionally destroyed emails that would have shown other examples in which GSCP employees complained about her to Mr. Beadle De Palomo. *See* Pl.'s Opp'n. at 42. The Court, however, already concluded that Ms. Nachbar's email, in combination with other complaints about Dr. Clemmons, did not alter the terms and conditions of Dr. Clemmons's employment and did not result in an adverse employment action.[15] Thus, even if additional criticisms were sent to Mr. Beadle De Palomo, such a fact is irrelevant to avoiding summary judgment because the emails, in and of themselves, are not probative of whether an adverse action ultimately occurred.

Finally, Dr. Clemmons seeks an inference that Messrs. Niblett and Downey read Ms. Nachbar's July 2008 email and then made negative comments to others based on the content of the email. *See id.* But additional evidence about how their opinions of Dr. Clemmons were formed would not create a dispute of material fact to save the defamation claim. This is because the Court granted summary judgment for AED on the basis that Dr. Clemmons brought the defamation claim in exclusive reliance on inadmissible hearsay, *see infra* Part IV.D, and the adverse inference she seeks would not change the Court's conclusion.

---

[15] In fact, Mr. Beadle De Palomo actually spoke up *in defense of* Dr. Clemmons after hearing such criticism, and he reassured Dr. Clemmons that he supported her and that the criticism did not affect his opinion of her. *See* Beadle De Palomo Dep. 232:5-11.

For these reasons, the Court concludes that even if spoliation occurred — and the Court takes no position on whether it did — any lost evidence was harmless because the adverse inferences that Dr. Clemmons seeks would not create a genuine dispute of material fact as to any of her causes of action. *See Burley v. Nat'l Passenger Rail Corp.*, No. CV 11-1222, 2014 WL 1278641, at \*7 (D.D.C. Mar. 31, 2014) (explaining that plaintiff's "request for a spoliation inference in connection with a videotape of the accident would not create a genuine issue of material fact" and granting defendant's motion for summary judgment). As such, the Court denies Dr. Clemmons's request, and the Court need not consider the remaining factors necessary for proving spoliation.

## V.  CONCLUSION

For the foregoing reasons, AED's motion for summary judgment is **GRANTED**, and the FHI 360 Defendants' motion for summary judgment is **DENIED WITHOUT PREJUDICE AS MOOT**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 30, 2014                                RUDOLPH CONTRERAS
                                                                          United States District Judge