# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |  |
|---|---|---|---|
| LYDIA CLEMMONS, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 10-0911 (RC) |
| | : | | |
| v. | : | Re Document No.: | 72 |
| | : | | |
| ACADEMY FOR EDUCATIONAL | : | | |
| DEVELOPMENT, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## <u>MEMORANDUM OPINION</u>

### DENYING PLAINTIFF'S MOTION TO ALTER OR AMEND JUDGMENT

## I.  INTRODUCTION

Now before the Court is Plaintiff Dr. Lydia Clemmons's motion to alter or amend a final

judgment of this Court.  By way of background, Dr. Clemmons brought suit against her former

employer, the Academy for Educational Development ("AED"), after resigning from the

company in 2009.  Dr. Clemmons alleged that she had experienced a hostile work environment,

constructive discharge, and retaliation in violation of Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. §2000e *et seq.*, and the District of Columbia Human Rights Act

("DCHRA"), D.C. Code §1-2501 *et seq.*, as well as defamation under District of Columbia law.

On September 30, 2014, this Court granted AED's motion for summary judgment as to all

claims.[1]  Dr. Clemmons now argues that the Court's judgment is the product of clear error.  She

---

[1]      In Dr. Clemmons's second amended complaint, she joined as a co-defendant
Family Health International, d/b/a FHI 360, FHI Development 360 LLC, and FHI Solutions LLC
(collectively, the "FHI 360 Defendants"), as AED's successor in interest. The Court's September
2014 Order granted summary judgment in favor of AED as to all claims, and therefore denied as
moot the FHI 360 Defendants' motion for summary judgment, which argued that successor
liability does not exist.  Because the Court denies Dr. Clemmons's motion to vacate the grant of

asks that the Court vacate its September 2014 judgment and that AED's motion for summary judgment be denied as to her hostile work environment and retaliation claims. She also asks the Court to grant a series of spoliation inferences that she claims were denied erroneously. Upon consideration of Dr. Clemmons's motion, the memoranda in support thereof and opposition thereto, the Court will deny the motion to alter or amend judgment.

## II.  FACTUAL BACKGROUND[2]

During Dr. Clemmons's period of employment, AED managed two projects in Ghana that addressed HIV prevention for at-risk populations: the Strengthening HIV and AIDS Response Partnership Project ("SHARP") and the Ghana Sustainable Change Project ("GSCP"). *See* Def.'s Stmt. of Undisputed Facts ¶ 2, ECF No. 56 ("SOF"). Dr. Clemmons, an African-American woman, served as Chief of Party ("COP") for SHARP. Her immediate supervisor was initially Michael Kaplan, *see id.* ¶ 24, but Cheryl Mayo assumed that role in July 2008, Pl.'s Stmt. of Disputed Facts ¶ 91, ECF No. 68-1 ("SDF"). At all times, Dr. Clemmons's second-level supervisor at AED was Frank Beadle de Palomo ("Mr. Beadle"). *See* SOF ¶ 16.

Jacqui Larsen also worked for AED, serving first as the Deputy COP for GSCP and then as GSCP's COP beginning in late 2007. *See* SOF ¶ 6. Ms. Larsen's direct supervisor was Nancy Nachbar, *see id.* ¶ 7, who in turn was supervised by Margaret Parlato and Mark Rasmuson, SDF ¶ 75. Dawn McCown became GSCP's Deputy COP in January 2009. SOF ¶ 8. Ms. Larsen, Ms. Nachbar, and Ms. McCown are all Caucasian. *See* SDF ¶ 135.

---

summary judgment to AED, the FHI 360 Defendants' motion remains moot.

[2] The following facts are limited to the issues relevant to the pending motion and are drawn from the Court's prior Memorandum Opinion and from the record produced by the parties at summary judgment. The page numbers cited are those generated by the Court's electronic filing system.

The United States Agency for International Development ("USAID") was the principal funder and client for both SHARP and GSCP. *See* 2d Am. Compl. ("SAC") ¶¶ 8, 15, ECF No. 28. BethAnne Moskov, USAID's Director for Health, Population and Nutrition, managed the U.S. Government's health-related funded activities in Ghana, including both SHARP and GSCP, starting in August 2005. *See* SOF ¶ 9; Moskov Dep. 7:20–8:04, Aug. 19, 2013, ECF No. 68-19. USAID's Peter Wondergem reported to Ms. Moskov on SHARP's progress and activities, while Susan Wright reported on GSCP. SOF ¶ 10.

## A. Pre-Complaint Conflict in the Workplace

By all accounts, Dr. Clemmons had a rocky relationship with Ms. Larsen and Ms. McCown of GSCP, and with Ms. Nachbar, who supervised Ms. Larsen and Ms. McCown. Their professional interactions were often unpleasant, marked by criticism and conflict. *See* SOF ¶¶ 19–21, 26–28 (describing mutual dislike and "increasing tensions and difficulties"); SDF ¶ 35 (alleging that Ms. Larsen and Ms. McCown sneered, yelled, rejected feedback, and displayed "hostile facial expressions and body language" to Dr. Clemmons); Def.'s Ex. O-5, ECF No. 56-17 (alleging that Dr. Clemmons made "passive aggressive attacks on our work" and "continue[d] to make everything unbearably difficult, complex, changeable, and unpleasant" for GSCP).

AED attributes the contentious relationships to personality differences between the women that were compounded by the competitive relationship between SHARP and GSCP, both of which vied for attention and resources from USAID. *See* SOF ¶ 19; Beadle Dep. 216:3–216:15, Nov. 6, 2013, ECF No. 68-12. A Joint Implementation Plan ("JIP") was devised in May 2007 with the goal of addressing the "disconnection" between SHARP and GSCP by requiring the two projects to increase collaboration on certain tasks. *See* Pl.'s Ex. G-173, ECF No. 68-10; Moskov Dep. 66:20–68:8. "GSCP became responsible for producing all communications

materials used and needed by SHARP . . . [and] SHARP's contact with GSCP increased" as a result of the JIP.  Shillingi Decl. ¶ 7, Pl.'s Ex. F-113, ECF No. 68-9.  But the plan backfired, ultimately increasing tensions between SHARP and GSCP as SHARP staff expressed concerns about the quality and timeliness of GSCP's work.  *See id.* at ¶¶ 7–10; Moskov Dep. 67:16–68:17.

Relatedly, AED contends that another root cause of the conflict between Dr. Clemmons and GSCP's leadership was Dr. Clemmons's persistent criticism of Ms. Larsen and GSCP, which contributed to the deteriorating relationship between the projects.  For example, Dr. Clemmons copied USAID on e-mails noting that data from GSCP was overdue or had "quality problems," Def.'s Exs. O-119–20, ECF No. 56-19, accused GSCP of doing technically unsound "slap-dash work" that required correcting, *see* Def.'s Ex. O-116, ECF No. 56-19, and alleged that GSCP would routinely and "deliberately wait until the last minute to spring something on SHARP so as to limit [their] ability and time to provide any inputs," Pl.'s Ex. F-127, ECF No. 68-9.  The GSCP team did not take kindly to being told that their materials "were not suitable" or that there were "problems with the quality of the work produced by the GSCP project."  *See* Shillingi Decl. ¶¶ 10–12, Pl.'s Ex. F-113.  They began to feel that Dr. Clemmons was "very deliberately undermin[ing]" them because nothing they did was "ever satisfactory and more changes [were] always required," Def.'s Ex. O-58, ECF No. 56-18, and they claimed that her "passive aggressive attacks on [their] work" made them "miserable," "tearful," and "depressed," Def.'s Ex. O-5, ECF No. 56-17; *see also* McCown Dep. 122:3–122:11, Oct. 8, 2013, ECF No. 68-18 (describing "feeling devalued and belittled").  GSCP members also complained about Dr. Clemmons verbally attacking them when providing technical feedback, and about her deliberately undermining GSCP in front of USAID.  *See* Clemmons Dep. 106:18–108:3, Aug. 2,

2013, ECF No. 68-13; Def.'s Ex. O-58 (describing GSCP staff as feeling undermined and "deeply upset" by Dr. Clemmons).

Dr. Clemmons, on the other hand, maintains that Ms. Larsen and Ms. McCown were responsible for creating a hostile work environment by rejecting her technical feedback on GSCP projects and by criticizing her to others in AED and at USAID. According to Dr. Clemmons, this behavior amounted to workplace mobbing, a "type of bullying" where "colleagues attack your dignity, integrity and competence over a period of months or years . . . [until] more co-workers unquestioningly accept the party line that you are unpleasant and inept and have no place in the organization." Def.'s Ex. O-1, ECF No. 56-17 (internal quotation marks omitted). Dr. Clemmons alleges that the mobbing occurred because of her race, and she observed that Ms. Larsen and Ms. McCown did not express the same hostility to feedback from white individuals or African individuals who were not in similar positions of authority. Clemmons Dep. 124:15–22. She also alleges that on one occasion, Ms. Larsen told Dr. Clemmons that she was "just like a dog . . . like a terrier that won't let go of a bone . . . like a . . . little dog that won't let go of a pant leg after it sunk its teeth into it, no matter how much you try to shake it off." Pl.'s Resp. to Def.'s Interrog. No. 3-2, Def.'s Ex. O-111, ECF No. 56-19.

To illustrate the mobbing at issue, Dr. Clemmons points first to the fact that Mr. Kaplan's view of her changed from supportive in October 2007 to unsupportive in February 2008, allegedly as a result of the workplace mobbing. *See* Pl.'s Opp'n to Def.'s Mot. Summ. J. at 23, ECF No. 68. In October 2007, Dr. Clemmons "expressed [her] concerns about the human resources available within GSCP to actually implement the joint plan," first in a meeting with GSCP on October 8, and then in an email she sent that same day to both Mr. Kaplan and Mr. Rasmuson. Def.'s Ex. O-115, ECF No. 56-19. Dr. Clemmons asserts that Ms. Larsen then made

a baseless complaint about her behavior at the October meeting to Ms. Parlato, who in turn called Mr. Kaplan to complain about Dr. Clemmons "denounc[ing] GSCP to Bethanne Moskov of USAID." Clemmons Decl. ¶ 1, Pl.'s Ex. B, ECF No. 68-5. Mr. Kaplan responded immediately to support Dr. Clemmons by calling Ms. Moskov and confirming that the accusation that Dr. Clemmons had denounced GSCP to USAID was unfounded. *See id.*

By February 2008, however, Dr. Clemmons had lost Mr. Kaplan's support. Dr. Clemmons's subordinate had requested a modification in benefits, Mr. Kaplan denied the request, and the subordinate complained to Dr. Clemmons that Mr. Kaplan was "discriminating against her because of national origin and race." *See* Pl.'s Resp. to Def.'s Interrog. Nos. 16, 18-1, Def.'s Ex. O-111. Dr. Clemmons raised her subordinate's discrimination complaint against Mr. Kaplan with human resources ("HR"), and her relationship with Mr. Kaplan changed shortly after that. *Id.* Dr. Clemmons recalls that Mr. Kaplan went from defending her from GSCP's criticisms to agreeing with GSCP that she was "disingenuous, manipulative, and not direct." *See* Def.'s Ex. O-8 at 52–53, ECF No. 56-17 (internal quotation marks omitted). When she asked for an explanation, Mr. Kaplan stated that Dr. Clemmons had "told [Mr. Kaplan that she] would stand down, respect his authority and not intervene further [in the benefits matter], but in fact, [she] did go further," ultimately raising the issue with HR and Mr. Beadle. *Id.* On February 18, 2008, Dr. Clemmons complained to Mr. Beadle about the incident with Mr. Kaplan, saying that she had been criticized unfairly "as a result of my raising the [employee's] benefits [issue] with HR and with you." *Id.* Mr. Kaplan withdrew from his role as Dr. Clemmons's supervisor that same month. *See* Pl.'s Resp. to Def.'s Interrog. No. 19, Def.'s Ex. O-111.

Dr. Clemmons next alleges that over the course of numerous calls, emails, and meetings, Ms. Larsen was hostile, impatient, and rude. Clemmons Dep. 108:17–111:1. Specifically, Ms.

Larsen repeatedly interrupted Dr. Clemmons, spoke over her, and dismissed or ignored Dr. Clemmons's comments and suggestions. *See id.* at 119:17–120:1. Dr. Clemmons's feedback to GSCP was greeted with sneering facial expressions, or "a small giggle or a note written down on a piece of paper and slid over to a colleague while [Dr. Clemmons] was speaking." *Id.* at 108:17–22. Additionally, although both GSCP and SHARP staff repeatedly were told not to discuss the other project in front of USAID unless representatives from both projects were in attendance, Dr. Clemmons felt that the message was "underscored with [her]," and not communicated "with the same level of emphasis" to GSCP and Ms. Larsen. *Id.* at 232:16–234:20; *but see* Def.'s Ex. O-26, ECF No. 56-18 (email from Dr. Clemmons stating that both she and Ms. Larsen had received the same "strong guidance" on the subject).

In April 2008, Dr. Clemmons says that she told Mr. Beadle that she suspected that some of her problems with Ms. Larsen and Ms. McCown "were tied to racist attitudes," but that she knew certain behavior could be taken different ways and so she wanted him to speak with them to see what he thought. *See* Clemmons Dep. 118:15–120:22; 126:12–127:13. Mr. Beadle disputes Dr. Clemmons's assertion that she ever mentioned race as a possible cause of the SHARP-GSCP conflict, noting that both Dr. Clemmons and Ms. Larsen made similar complaints about the other's rudeness, lack of respect, and a lack of professionalism. Beadle Dep. 101:11–17, 114:18–20. Nevertheless, Mr. Beadle met with Dr. Clemmons and Ms. Larsen, first individually and then together, in an effort to understand and improve the working relationship between the two women. *Id.* at 99:13–103:9. The joint meeting concluded with Mr. Beadle's recommendations as to how they could communicate to reduce conflict, and Dr. Clemmons and Ms. Larsen agreed to try to work together professionally going forward. *See id.* at 110:12–111:15; Clemmons Dep. 240:5–243:9.

On July 13, 2008, however, Ms. Nachbar emailed her supervisors and Mr. Beadle about Dr. Clemmons's conduct during a joint SHARP-GSCP meeting with USAID.  *See* Def.'s Ex. O-5, ECF No. 56-17; Def.'s Ex. O-56, ECF No. 56-18.  Because Ms. Nachbar did not attend the meeting, the information provided in her emails was derived from a conversation with Ms. Larsen.  *See* Nachbar Dep. 154:18–155:13, May 24, 2013, ECF No. 68-20.  Ms. Nachbar wrote that Dr. Clemmons was "out of control and attempts to manage her have failed."  Def.'s Ex. O-5. She claimed that Dr. Clemmons had lied at the joint meeting by saying she had not seen GSCP's materials prior to the meeting, and that she was undermining the work of GSCP and AED in Ghana by producing a lengthy list of criticism of GSCP's materials.  *See id.*; Def.'s. O-56. Additionally, Ms. Nachbar asserted that USAID representative Susan Wright told the GSCP staff after the meeting that "she was sorry they had to endure the experience . . . [and Dr. Clemmons] had made herself look very silly and almost sad."  Def.'s Ex. O-5.  Ms. Nachbar concluded her email to her supervisors by stating that while she believed Dr. Clemmons "should be removed . . . if that's not going to happen, there need to be consequences."  *Id.*  Her email to Mr. Beadle similarly stated that her "own belief is that [Dr. Clemmons's] behavior warrants dismissal, but at a minimum, there should be consequences."  Def.'s Ex. O-56.

After receiving the email, Mr. Beadle contacted Dr. Clemmons to inform her about Ms. Nachbar's account of the joint meeting, and he personally initiated an investigation into the accusations of unprofessional conduct.  *See* Def.'s Ex. O-76, ECF No. 56-18.  Mr. Beadle spoke with meeting attendees from SHARP, GSCP, and USAID, and reviewed relevant documents, *see* Def.'s Ex. O-57, ECF No. 56-18; Beadle Dep. 227:3–19.  In her conversation with Mr. Beadle, Dr. Clemmons did not tell him that she believed the July 2008 email was attributable to racism. Clemmons Dep. 320:1–15; Beadle Dep. 227:20–228:4.

At the end of his investigation, Mr. Beadle concluded that the allegations of unprofessional conduct in Ms. Nachbar's email were meritless.  Accordingly, on July 16, 2008, he sent an email to Ms. Nachbar criticizing her judgment and stating that she should have listened to both sides before sending the email.  *See* Def.'s Ex. O-58 ("For you, with Jacqui's ammunition, to have jumped to a public lynching of Lydia and the SHARP team without having listened to all sides was not the best of judgment.").  AED limited Ms. Nachbar's visibility with senior management and denied her desirable roles within the organization.  *See* Beadle Dep. 153:5–155:6.

Mr. Beadle communicated the results of the investigation to Dr. Clemmons, and he told her that Ms. Nachbar's opinion would not adversely affect her employment at AED.  *See* Beadle Dep. 231:13–232:17.  He also informed Dr. Clemmons that he possessed a favorable opinion of her and her work for SHARP.  *See id.*  On September 2, 2008, Dr. Clemmons thanked Mr. Beadle for the investigation and his support, but said that upon learning that Ms. Nachbar's email had recommended that she be fired, she felt compelled to raise the issue with HR.  *See* Def.'s Ex. O-78, ECF No. 56-18.

### B.  The Formal Grievance and Allegations of Retaliation

When Mr. Beadle heard that Dr. Clemmons intended to complain to HR, he responded by telling Dr. Clemmons that he had already handled the matter, that he did "not support [her] taking this to HR," and that if she chose to pursue the matter further, she would need to do it "alone and without [his] support."  *Id.*  He explained that the complaint "will only create worse feelings between you and GSCP, and will most definitely make the situation worse.  It will swallow your time and make you less productive … which will have a direct impact on your performance and my view and review of your work."  *Id.*  At the same time, Mr. Beadle

reassured Dr. Clemmons that the situation with GSCP had "no bearing whatsoever" on how he viewed her work, and that Ms. Larsen and Ms. Nachbar "have nothing to do with your professional reputation.  If you do a good job, the project accomplishes its deliverables, then everything will be fine."  *Id.*  Ms. Mayo also emailed Dr. Clemmons stating that she agreed with Mr. Beadle's advice, that both she and Mr. Beadle "fully support" her, and that she encouraged Dr. Clemmons to "take a step back" from the situation.  *Id.*

After considering her supervisors' advice, on October 6, 2008, Dr. Clemmons informed Mr. Beadle and Ms. Mayo that she had decided to file a formal grievance after all.  Def.'s Ex. O-8 at 49.  And on October 7, 2008, Dr. Clemmons emailed a grievance to AED's Chief Management Officer, Ricardo Villeta, claiming that she had experienced workplace mobbing, bullying, and malicious gossip "originating from Jacqui Larsen and propagated through Nancy Nachbar."  *See* Def.'s Ex. O-1.  The grievance deemed the pair's actions "dishonest and mean-spirited," and it alleged that they had "conducted an intensive, highly personal, and prejudicial campaign against me with a clear goal of forcing me out of my employment with AED while covering up shortcomings within their own team."  *Id.*

Marti McClintock, AED's Senior Employee Relations Officer, handled the investigation into Dr. Clemmons's grievance.  She interviewed Dr. Clemmons by phone on October 14, 2008, and after the phone interview, Dr. Clemmons sent Ms. McClintock emails and documents that she believed addressed the key points of the grievance.  *See* Def.'s Ex. O-8; Def.'s Ex. O-9, ECF No. 56-17.  In one email, Dr. Clemmons explained that she believed that "what began to happen, and what triggered the mobbing, was that GSCP[] somehow decided to try to cover up their gaps in technical expertise rather than addressing them, and to go on the offensive, labeling me with some of the terms I described (i.e., trouble-maker, patronizing, not a team player, etc.)."  Def.'s

Ex. O-9.  On November 21, 2008, Dr. Clemmons emailed Ms. McClintock a photograph of Ms. Larsen, Ms. Nachbar, and Ms. McCown socializing together to show "just how close-knit the relationships are between the GSCP staff and the USAID staff."  Def.'s Ex. O-22A, ECF No. 56-18.  Dr. Clemmons also recalls speaking with Ms. McClintock on an unspecified date after filing her grievance and asking whether Ms. McClintock knew that she was African-American and that Ms. Larsen, Ms. McCown, and Ms. Nachbar were Caucasian.  Clemmons Dep. 141:11–16.  Ms. McClintock indicated that she was aware of that fact.  *Id.*

Ms. McClintock also interviewed Ms. Mayo, Mr. Beadle, and Ms. Nachbar.  *See* McClintock Dep. 20:20–21:10, April 30, 2013, ECF No. 68-17.  Ms. McClintock's handwritten notes pertaining to her interview of Mr. Beadle indicate that Mr. Beadle said that there were "longstanding issues," with the supervisors of GSCP and the "perception [that Dr. Clemmons was] doing something to embarrass them and make them look bad."  Pl.'s Ex. D-17, ECF No. 68-7.  Ms. McClintock also noted that the allegations did not affect Mr. Beadle's view of or support for Dr. Clemmons, and she wrote that Mr. Beadle "believes may be racial, as well."  *Id.* Ms. Mayo told Ms. McClintock that she believed that the conflict was driven by "personality and personal issues," communication and "workplace problems," and that she believed "race and racial stereotypes" were also at play.[3]  Mayo Dep. 252:15–253:4, June 18, 2013, ECF No. 68-16. Ms. McClintock did not interview Ms. Larsen, though she did confirm with Ms. Nachbar that Ms. Larsen had been counselled about remaining professional when working with Dr. Clemmons.  *See* Def.'s Ex. O-28, ECF No. 56-18.

---

[3] Ms. Mayo traces her belief that race was a factor in the conflict to a statement that Mr. Beadle made shortly after she took over as Dr. Clemmons's supervisor.  According to Ms. Mayo, Mr. Beadle described Dr. Clemmons as someone who "looks like Vanessa Williams," is "very intelligent . . . has a lot of experience and a commanding presence," and "intimidates the dowdy, white women of [GSCP]."  Mayo Dep. 89:13–20; 92:8–99:18; 252:7–254:14.

On October 20, 2008, two weeks after filing her mobbing grievance, Dr. Clemmons received an "excellent" performance rating on her annual review, along with a 4.5% salary increase. Def.'s Ex. O-90, ECF No. 56-19. AED's "Annual Salary Review Guidelines," which were issued yearly by AED's president and CEO, established a range of merit-based salary percentage increases that corresponded with an employee's base salary and annual performance rating. *See* Def.'s Ex. O-88, ECF No. 56-19. Given Dr. Clemmons's salary and performance rating, however, 4.5% was the lowest possible raise that she could have been awarded pursuant to AED policy, which established a range of 4.5% to 6% for someone in Dr. Clemmons's position that year. *See* Def.'s Ex. O-88. Dr. Clemmons had also received an "excellent" performance rating and the lowest possible salary increase in 2006, before she filed her grievance. *See* Def.'s Ex. O-139, ECF No. 56-20; Def.'s Ex. O-140, ECF No. 56-20. But in 2007, Dr. Clemmons's "excellent" performance rating had entitled her to a salary increase between 4.1% and 5.5%, and she had received a 5.0% increase. *See* Def.'s Ex. O-213, ECF No. 56-20.

Two other high-performing COPs also received the minimum allowable salary increases in 2008. Stan Terrell, a Caucasian COP for a project in the Dominican Republic, was eligible to receive a merit-based increase between 2.5% and 4.0%, and he received an increase of 2.5%. *See* Def.'s Ex. O-88; Def.'s Ex. O-211, ECF No. 56-20; Beadle Dep. 238:10–239:18. Licida Bautista, a Latina COP for a project in Honduras, also received a rating of "Excellent," was eligible for a salary increase between 5.5% and 7.0%, and received the minimum salary increase of 5.5%. Def.'s Ex. O-88; Def.'s Ex. O-212, ECF No. 56-20; Beadle Dep. 239:19–241:2.

On December 2, 2008, Dr. Clemmons emailed Ms. Mayo to request fourteen days of paid leave. *See* Def.'s Ex. O-86, ECF No. 56-19. At the time, Dr. Clemmons had a negative vacation

balance that would return to a zero balance at the end of the year.  *See id.*  Because Dr.

Clemmons had a negative leave balance, Ms. Mayo forwarded the request to Dan White, AED's

Senior Financial Director, for a recommendation, and then sent Mr. White's recommendation to

Mr. Beadle for final approval.  Mayo Dep. 301:2–307:6.  Mr. White recommended advancing

five days of vacation leave and one day of personal leave, which is the amount Dr. Clemmons

would have accrued in the first quarter of the next year, ending March 31, 2009.  *See* Def.'s Ex.

O-86.  Ms. Mayo agreed with Mr. White's recommendation, and Mr. Beadle approved it.  *See

id.*; Def.'s Ex. O-87, ECF No. 56-19; Mayo Dep. 303:9–306:3.  After receiving a complaint from

Dr. Clemmons about the leave decision, Ms. McClintock asked if Mr. Beadle would reconsider

the decision to advance six days instead of fourteen, noting that Dr. Clemmons's contract would

not allow her to take leave during the last six months of the project.  *See* Pl.'s Ex. E-93, ECF No.

68-8.  Mr. Beadle declined to do so.  *Id.*

Citing the leave decision and continued undermining by Ms. Larsen, as well as plans to

have SHARP work with GSCP in a sub-contractor role that would require Dr. Clemmons to

report in some capacity to Ms. Nachbar, Dr. Clemmons contacted Ms. McClintock on December

19, 2008, raising the specter of "[p]ossible retaliation."  Def.'s Ex. O-26, ECF No. 56-18.  She

also told Ms. McClintock on December 23, 2008, that she was "now seeking legal advice . . . due

to [her] growing alarm that [her] professional reputation and future employment opportunities

have been harmed through [her] employment with AED and all of the fall-out with USAID in

Ghana."  *Id.*

Dr. Clemmons's concern about reporting to GSCP and Ms. Nachbar traces back to an

August 2008 agreement to transfer $500,000 in USAID funding from GSCP to SHARP.  *See*

Def.'s Ex. O-81, ECF No. 56-18.  In December 2008, Dr. Clemmons learned that the $500,000

would not be transferred directly to SHARP because the project had reached its funding cap.  *See* Pl.'s Resp. to Def.'s Interrog. No. 19-5, Def.'s Ex. O-111; Def.'s Ex. O-68.  Instead, GSCP accepted the funds on behalf of SHARP, and SHARP had to report how it used those funds to Ms. Nachbar.  *See* Pl.'s Resp. to Def.'s Interrog. No. 19-5; Def.'s Ex. O-74, ECF No. 56-18.  Dr. Clemmons alleges that Mr. Beadle told her that she could not hire any consultants or part-time staff to accomplish the additional work caused by the transfer and reporting requirements, and that this resulted in her working "7 days a week and 15-16 hour days."  *See* Pl.'s Resp. to Def.'s Interrog. No. 19-5, Def.'s Ex. O-111.  On January 13, 2009, AED informed Dr. Clemmons that they had provided her incorrect information previously, and that she could, "in fact, locally hire a third-country consultant," to which Dr. Clemmons replied by explaining that she had one consultant working on activities under the $500,000 transfer and that she would hire another "to handle the bi-weekly reporting on activities under the $500,000 transfer."  Def.'s Ex. O-82, ECF No. 56-18.  She also worked with AED to modify the reporting template so that it would ideally require only a "10 minute effort."  *Id.*

On January 7, 2009, Ms. McClintock emailed Dr. Clemmons a "close-out" report setting forth the key findings from her mobbing investigation, explaining that:

> [She] did not find a collaborative or collective effort to have [Dr. Clemmons] terminated, and/or a campaign against [her]. However, [Ms. McClintock] did find inappropriate behavior and actions to have taken place in the past. The people who were involved with such actions have been formally addressed, very clearly and directly. As a result, it is our expectation that [Dr. Clemmons] will not experience similar actions to take place in the future. However, if that is not the case, [she is] asked to inform HR[.]

Def.'s Ex. O-134, ECF No. 56-20.  Dr. Clemmons alleges that she did, in fact, experience similar mobbing actions in January 2009 at a meeting with Ms. Larsen, Ms. McCown, and BethAnne Moskov of USAID.  *See* Clemmons Dep. 382:13–387:1.  Dr. Clemmons and her subordinate were delayed in entering the meeting and arrived to find Ms. Larsen, Ms. McCown, and Ms.

Moskov already in conversation.  *Id.*  Ms. Moskov and Ms. Larsen then began criticizing Dr.

Clemmons for sending an email on January 9 that stated that GSCP had not shown SHARP

certain materials or coordinated with them about an action plan.  *Id.*; *see* Pl.'s Ex. G-190, ECF

No. 68-10.  Ms. Moskov said that "she was tired of this kind of behavior," and "in unison,

almost" with Ms. Larsen, she said that the email response was "inappropriate, slowing things

down, ridiculous."  Clemmons Dep. 386:6–20.

Dr. Clemmons then emailed Ms. McClintock on January 15, 2009, to let her know that

she "as well as the SHARP project, have been experiencing retaliation.  Recent events have

confirmed that the retaliation, as well as the workplace mobbing, are based on discrimination and

unfair treatment based on race." *See* Def.'s Ex. O-29, ECF No. 56-18.  In response, Ms.

McClintock asked Dr. Clemmons to provide more details about these incidents, *see id.*, but Dr.

Clemmons never replied to Ms. McClintock, *see* McClintock Dep. 218:12–14.  Dr. Clemmons

tendered her resignation on March 9, 2009, to be effective June 2009.  *See* SDF ¶¶ 196, 198.

Dr. Clemmons asserts that after resigning, she learned additional information about the

workplace mobbing.  Specifically, she alleges that Mary Lyn Field, then an AED Vice President,

told a senior manager with another company that there were "management problems" within

SHARP and implied that Dr. Clemmons was "a problem for AED."  *See* Clemmons Dep. 26:4–

32:13.  Further, in February 2009 Ms. Field allegedly approached a former colleague of Dr.

Clemmons who was in a group of international health professionals on their way to an

HIV/AIDS conference, and asked in an insinuating tone whether Dr. Clemmons was "difficult"

at her last job.  *See id.* 46:4–48:21.  Dr. Clemmons also alleges that in October 2011, Ms.

Moskov gave her a negative reference and said that Dr. Clemmons tended to "cry racism when

things are not going her way." *See* Pl.'s Ex. H-193, ECF No. 68-11; Pl.'s Ex. H-194, ECF No.

68-11.

### C.  Procedural History

On September 30, 2014, this Court granted AED's motion for summary judgment as to

all claims.  The Court explained that while it was "not entirely clear" whether the workplace

mobbing occurred because of Dr. Clemmons's race, it was clear that Dr. Clemmons had failed to

establish that the alleged harassment was so "'severe or pervasive' as to 'alter the conditions of

the plaintiff's employment and create an abusive working environment" actionable under Title

VII and the DCHRA.  *Clemmons v. Acad. for Educ. Dev.*, No. 10-cv-0911, 2014 WL 4851739, at

*10–12 (D.D.C. Sept. 30, 2014) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786

(1998)).

The Court also granted summary judgment to AED on Dr. Clemmons's retaliation

claims, which were premised on: (1) Mr. Beadle's alleged threat that filing a grievance would

negatively affect her performance evaluation, (2) the fact that she received the lowest possible

raise, (3) the fact that she was advanced only six days of leave, and (4) the fact that she had to

report to Ms. Nachbar regarding USAID's $500,000 grant.  *Id.* at *13–16.  The Court explained

that several of the allegedly retaliatory actions were not materially adverse, and that Dr.

Clemmons did not produce sufficient evidence to counter AED's non-retaliatory explanations for

a number of its actions.  *Id.*

The Court also awarded summary judgment to AED as to Dr. Clemmons's claims of

constructive discharge and defamation, *id.* at *16–19, but Dr. Clemmons does not presently

dispute those rulings.  Finally, the Court declined to grant Dr. Clemmons's request for four

adverse inferences based on alleged spoliation because none of the requested inferences were

sufficient "to create the genuine disputes of material fact necessary to avoid summary judgment." *Id.* at \*20.

On October 28, 2014, Dr. Clemmons filed the instant motion to alter or amend judgment, arguing that the Court's judgment should be vacated, that she should be granted adverse inferences based on AED's spoliation, and that summary judgment should be denied as to her hostile work environment and retaliation claims.  Pl.'s Mot. Alter Jdgmt., ECF No. 72.

### III.  LEGAL STANDARD

Federal Rule of Civil Procedure 59(e) permits a party to file "[a] motion to alter or amend a judgment" within "28 days after the entry of the judgment."  Fed. R. Civ. P. 59(e). "Reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly," *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 17 (D.C. Cir. 2015) (quoting 11 Charles Alan Wright *et al.*, Federal Practice & Procedure § 2810.1 (3d ed. 2012)), and the moving party bears the burden of establishing "extraordinary circumstances" warranting relief from judgment, *Niedermeier v. Office of Baucus*, 153 F. Supp. 2d 23, 28 (D.D.C. 2001).

Rule 59 does not permit a dissatisfied party "to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (internal quotation marks and citations omitted).  Ultimately, "[a] Rule 59(e) motion is discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Ciralsky v. C.I.A.*, 355 F.3d 661, 671 (D.C. Cir. 2004) (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996)).  "New evidence" is evidence that "was not previously available," not simply evidence that was not previously presented.  *See Messina v. Krakower*, 439 F.3d 755,

759 (D.C. Cir. 2006).  And in the Rule 59(e) context, "clear error" is "'a very exacting standard,'" *Bond v. U.S. Dep't of Justice*, 286 F.R.D. 16, 22 (D.D.C. 2012) (quoting *Lightfoot v. District of Columbia*, 355 F. Supp. 2d 414, 422 (D.D.C. 2005)), tantamount to a requirement that the judgment be "dead wrong," *Lardner v. FBI*, 875 F. Supp. 2d 49, 53 (D.D.C. 2012) (quoting *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988)).  "Manifest injustice," on the other hand, requires a demonstration not only of "clear and certain prejudice to the moving party, but also a result that is fundamentally unfair in light of governing law." *Slate v. Am. Broad. Cos., Inc.*, 12 F. Supp. 3d 30, 35–36 (D.D.C. 2013).

## IV.  ANALYSIS

In her motion to alter or amend judgment, Dr. Clemmons argues first that the Court erred in holding that no reasonable jury could find that the mobbing was so severe or pervasive as to have altered the conditions of her employment and created an actionable hostile work environment.  Specifically, she contends that the Court failed to consider the totality of the circumstances – including how others' views of Dr. Clemmons were negatively impacted by the alleged mobbing – and that the Court relied on cases that are not applicable to a hostile work environment claim.  Pl.'s Mot. Alter Jdgmt. at 6–13.  She also maintains that the Court erred by failing to find that the hostile work environment was based on race, and by finding that Mr. Beadle continued to support her after she filed her grievance.  *Id.* at 13–14.  As to her retaliation claims, Dr. Clemmons argues that the Court erred in finding that Mr. Beadle's statement was not a threat and that none of the allegedly retaliatory acts constituted materially adverse actions.  *Id.* at 15–20.  Finally, Dr. Clemmons argues that the Court erred by denying a spoliation inference because the requested inferences could bear on whether the alleged harassment was severe or pervasive.  *Id.* at 20–22.  The Court considers each argument in turn.

### A.  Hostile Work Environment Claim under Title VII and DCHRA[4]

To establish a prima facie hostile work environment claim under Title VII and the

DCHRA, Dr. Clemmons was required to show that (1) she is a member of a protected class; (2)

she was subject to unwelcome harassment; (3) the harassment occurred because of her race; and

(4) the harassment affected a term, condition, or privilege of employment.  *See Nurriddin v.*

*Goldin*, 382 F. Supp. 2d 79, 107 (D.D.C. 2005); *Kelley v. Billington*, 370 F. Supp. 2d 151, 156

(D.D.C. 2005); *see also Elam v. Bd. of Trs.*, 530 F. Supp. 2d 4, 22 n.7 (D.D.C. 2007) ("The

elements of a hostile work environment claim under the DCHRA mirror the federal

requirements." (citing *Lively v. Flexible Packaging Assoc.*, 830 A.2d 874, 889 (D.C. 2003)).  In

its prior opinion, this Court expressed doubt as to whether Dr. Clemmons had established that the

mobbing occurred because of her race, but the Court ultimately found that it was not necessary to

decide the issue because no reasonable juror could find the alleged harassment was sufficiently

severe or pervasive to give rise to an actionable hostile work environment.  *See Clemmons*, 2014

WL 4851739, at *10.

In her motion to alter or amend judgment, Dr. Clemmons points to a number of facts that

she believes the Court failed to consider in its analysis, and she argues that the Court erred as a

---

[4] The DCHRA and Title VII both prohibit employers from discriminating against individuals with respect to "compensation, terms, conditions, or privileges of employment," because of race.  *See* D.C. Code § 2-1402.11(a)(1).  The D.C. Court of Appeals "has made clear that federal case law addressing questions arising in Title VII cases is applicable to the resolution of analogous issues raised regarding DCHRA claims." *Ali v. District of Columbia*, 697 F. Supp. 2d 88, 92 n.6 (D.D.C. 2010) (citing *Howard Univ. v. Green*, 652 A.2d 41, 45 & n.3 (D.C. 1994)). Further, "in considering claims of discrimination under the DCHRA, [courts] employ the same three-part, burden-shifting test articulated by the Supreme Court for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)."  *Hollins v. Fed. Nat. Mortg. Ass'n*, 760 A.2d 563, 571 (D.C. 2000).  Thus, because Dr. Clemmons alleges the same facts and violations under both Title VII and the DCHRA, and because both statutes apply the same legal standard and burden-shifting framework, the Court considers the claims simultaneously.

matter of law by requiring her to demonstrate that the mobbing had tangible consequences.  She also argues that the Court erred by failing to find that the harassment occurred because of her race, and by failing to consider that fact when assessing the harassment's severity.  For the reasons explained below, the Court finds that Dr. Clemmons has failed to establish the type of "extraordinary circumstances" that would warrant relief from the Court's grant of summary judgment to AED on her hostile work environment claim.  *See Niedermeier*, 153 F. Supp. 2d 23, 28 (D.D.C. 2001).

**1.  The Court's Consideration of Evidence that the Harassment was Severe or Pervasive**

Dr. Clemmons first argues that whether Mr. Beadle actually maintained a favorable opinion of Dr. Clemmons was a disputed fact, the truth of which the Court should not have presumed when assessing the mobbing's severity or pervasiveness.  Pl.'s Mot. Alter Jdgmt. at 14.  She points out that Mr. Beadle advised her not to file an HR grievance, *see* Def.'s Ex. O-78, and she alleges that he made a series of decisions that negatively affected her after she filed her grievance, *see* Pl.'s Resp. to Def.'s Interrog. No. 19, Def.'s Ex. O-111.  She also asserts that Mr. Beadle's deposition testimony that he "still" supported her in July 2008 could be viewed as implying that did not support her at a later date.  Pl.'s Mot. Alter Jdgmt. at 14 (quoting Beadle Dep. 152:14–153:4).

In its prior Memorandum Opinion, this Court explained that while Dr. Clemmons had argued that the mobbing was severe or pervasive because it negatively affected her reputation at AED, the summary judgment record showed that far from siding with those who criticized Dr. Clemmons, Mr. Beadle actually went to significant lengths to defend Dr. Clemmons from her critics and to assure her of his support.  *See Clemmons*, 2014 WL 4851739, at *11.  The Court's finding is supported by the deposition testimony of Mr. Beadle, Beadle Dep. 152:17–153:4;

231:13–232:22, by the emails that he sent defending Dr. Clemmons from Ms. Nachbar's allegations, *see* Def.'s Ex. O-58, and by Dr. Clemmons's own emails thanking Mr. Beadle for his support, *see* Def.'s Ex. O-78.  Dr. Clemmons now complains that the Court neglected to address evidence that Mr. Beadle later viewed Dr. Clemmons negatively as a consequence of her decision to file an HR grievance, but that evidence speaks to whether the grievance – not the mobbing – damaged Dr. Clemmons's reputation with her Mr. Beadle or gave rise to retaliation. It sheds no light on the severity or pervasiveness of the mobbing itself.

Even if evidence of Mr. Beadle's allegedly unfavorable treatment of Dr. Clemmons post-grievance could be relevant to the Court's mobbing analysis, however, Dr. Clemmons's summary judgment brief attributed Mr. Beadle's actions exclusively to retaliatory animus, not to workplace mobbing.  *Compare* Pl.'s Opp'n to Def.'s Mot. Summ. J. at 23–25 (failing to mention Mr. Beadle's changed opinion of Dr. Clemmons in the list of factors that showed the harassment was severe or pervasive) *with id.* at 33–37 (listing Mr. Beadle's "threat" and his unfavorable decisions as acts of retaliation caused by Dr. Clemmons's decision to file a grievance with HR).[5] Rule 59(e) does not allow Dr. Clemmons to recast her arguments and evidence at this late date. *See GSS Group Limited v. National Port Authority*, 680 F.3d 805, 812 (D.C. Cir. 2012) ("[A] Rule 59(e) motion may not be used to . . . raise arguments or present evidence that could have been raised prior to the entry of judgment." (internal quotation marks omitted)); *see also Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) ("Rule 59(e) . . . may not be used to

---

[5] In fact, the only mention of Mr. Beadle in the portion of Dr. Clemmons's brief pertaining to the severity or pervasiveness of the mobbing was a reference to his email condemning Ms. Nachbar for sending baseless criticisms of Dr. Clemmons in her July 2008 email.  *See id.* at 24.

relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." (internal quotation marks omitted)).

Dr. Clemmons next argues that the Court erred by basing its finding that the mobbing was not severe or pervasive solely on Mr. Beadle's favorable view of her; she claims that the Court improperly ignored evidence that Ms. Moskov, Mr. Kaplan, and Ms. Field were also influenced by the mobbing.  Pl.'s Mot. Alter Jdgmt. at 7–10.  Specifically, she claims that the Court ignored the fact that Mr. Kaplan turned against her, and that Ms. Field thought she was "difficult."  Dr. Clemmons also argues that the Court ignored evidence that Ms. Moskov was friends with Ms. Larsen and Ms. McCown, and that by January 2009, Ms. Moskov went from praising Dr. Clemmons's work to siding with Ms. Larsen and GSCP in criticizing her.  *Id.* at 8–9.

As an initial matter, Dr. Clemmons is incorrect in her assertion that the Court's hostile work environment analysis rested solely on Mr. Beadle's view of her work.  The Court's analysis was not so limited.  *See Clemmons*, 2014 WL 4851739, at *3–4 (summarizing Dr. Clemmons's allegations of harassment experienced from September 2007 until she filed her complaint); *id.* at *7 (summarizing allegations pertaining to mobbing, including the spread of false accusations to AED headquarters); *id.* at *8–12 (analyzing claims of mobbing, including the July 2008 email, spreading false rumors, and rude behavior).  The Court explicitly considered the "totality of the circumstances," when determining whether the mobbing was severe or pervasive, *id.* at *11, including Dr. Clemmons's assertion that the mobbing harmed her reputation, *id.*

As for Dr. Clemmons's assertion that the Court erred by failing to expressly consider Ms. Field's negative perception of her when considering the severity or pervasiveness of the alleged harassment, she is raising this argument for the first time in her Rule 59(e) motion.  Previously, Dr. Clemmons argued that Ms. Field's negative comments about her—the majority of which she

did not discover until after her employment with AED had ended—supported her defamation claim, not her hostile work environment claim. *Compare* Pl.'s Opp'n to Def.'s Mot. Summ. J. at 23–25 (failing to mention Ms. Field's opinion of Dr. Clemmons in the list of factors that established the severity or pervasiveness of the harassment) with *id.* at 40–41 (describing each of Ms. Field's statements as evidence of defamation under D.C. law). She cannot now seek to amend her hostile work environment briefing by means of a Rule 59(e) motion. *See Exxon Shipping Co.*, 554 U.S. at 485 n.5 (holding that Rule 59(e) cannot be used "to raise arguments . . . that could have been raised prior to the entry of judgment"). Even if Dr. Clemmons had argued that the mobbing was severe or pervasive because it affected the opinion of Ms. Field, however, she would have fared no better.

Dr. Clemmons now points to evidence that Ms. Field once told Ms. Mayo that she had heard that Dr. Clemmons was "difficult," *see* Mayo Dep. 318:22–319:20, and that Ms. Field asked another individual if Dr. Clemmons was "difficult," Pl.'s Resp. to Def.'s Interrog. No. 6, Def.'s Ex. O-111. She also claims that Ms. Field once mentioned to a former colleague of Dr. Clemmons that the SHARP project had "management problems," which the former colleague believed implied that Dr. Clemmons's leadership had been a problem. Bardfield Decl. ¶ 3, Pl.'s Ex. C, ECF No. 68-6. But Dr. Clemmons does not allege that any of these comments were made in her presence. *See* Clemmons Dep. 24:4–26:10, 46:4–48:4, 438:16–439:10. And while Dr. Clemmons alleges that Ms. Mayo told her about Ms. Field's first "difficult" comment in February or March 2009, she admits that she was not even aware of Ms. Field's other two conversations until after her employment at AED had ended. *See id.* As this Court has previously explained, comments or incidents of which a plaintiff was unaware during the time of her employment cannot be used to establish that she was subjected to a hostile work

environment.  *See, e.g.*, *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1046 (7th Cir.

2000) ("Mean-spirited or derogatory behavior of which a plaintiff is unaware, and thus never

experiences, is not 'harassment' of the plaintiff (severe, pervasive, or other)."); *Burnett v. Tyco

Corp.*, 203 F.3d 980, 981 (6th Cir. 2000) (explaining that hostile actions of which plaintiff is

unaware are not relevant to hostile work environment claim); *Dudley v. WMATA*, 924 F. Supp.

2d 141, 168 (D.D.C. 2013) (same); *Hutchinson v. Holder*, 815 F. Supp. 2d 303, 321 (D.D.C.

2011) (same).

Additionally, the fact that Ms. Mayo told Dr. Clemmons that Ms. Field said that she had

heard that Dr. Clemmons was "difficult" is simply not sufficient – even when considered

alongside Dr. Clemmons's other evidence – to make out a hostile work environment.  Whether

the product of workplace mobbing or simply office politics, this type of second-hand gossip may

be unprofessional and unpleasant to hear, but it lacks the severity or pervasiveness necessary to

affect the terms or conditions of employment and to give rise to an environment that is

subjectively and objectively hostile.  *Cf. Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 78–81

(D.D.C. 2007) (holding that comments made outside the plaintiff's presence about "cutting his

balls off" and suggesting that he was "disloyal," rumors about his disloyalty, a "threat" that he

could be assigned to a lower-level job, and various efforts to undermine him at work were part of

the "ordinary tribulations of the workplace" and did not give rise to an actionable hostile work

environment); *see also Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 108 (D.D.C. 2005) ("When

racial statements are not made directly to a plaintiff, generally a hostile environment cannot be

established.") *aff'd, sub nom. Nurriddin v. Griffin*, 222 F. App'x 5, 5–6 (D.C. Cir. 2007).

As for Mr. Kaplan and Ms. Moskov, Dr. Clemmons did argue previously that their

changed opinions of her should be considered as evidence of the mobbing's severity or

pervasiveness.  *See* Pl.'s Mot. Opp'n Summ. J. at 23.  Specifically, she argued that because Mr.

Kaplan defended her from criticisms in October 2007 but "inexplicably turned against

Clemmons by February 2008, . . . [a] jury could infer that . . . GSCP told Kaplan that Clemmons

was disingenuous and manipulative enough times, or with enough persuasive power, that he

came to believe it . . . ."  *Id.*  As for Ms. Moskov, she argued that Ms. Moskov had frequent

contact with Ms. Larsen and Ms. McCown, and that although she initially expressed a favorable

view of Dr. Clemmons, she later sided with GSCP and called Dr. Clemmons "disingenuous."  *Id.*

Dr. Clemmons now complains that the Court erred by ignoring evidence that Mr.

Kaplan's view of her was impacted by the mobbing, and she points to "an email Dr. Clemmons

wrote at the time," that she claims supports her argument about Mr. Kaplan.  Pl.'s Mot. Alter

Jdgmt. at 9.  But the email in question actually undermines Dr. Clemmons's position that Mr.

Kaplan's change in opinion was "inexplicable," but for severe or pervasive workplace mobbing.

On February 18, 2008, Dr. Clemmons emailed Mr. Beadle "to document [her] concern" about a

conversation that she had with Mr. Kaplan on February 12.  Def.'s Ex. O-8 at 52–53.  She wrote:

> I had scheduled the phone call with [Mr. Kaplan] in order to brief him and get his
> advice on how to handle the rising tensions between SHARP and GSCP over the
> joint implementation plan.  After I had briefed him on the situation, Michael said
> that he didn't know how to advise me, as his own perception of me seems to
> mirror what he has been hearing about me from GSCP . . . .  Michael said that an
> example is the situation with Lucy's benefits, and said that I had told him I would
> stand down, respect his authority and not intervene further, "but in fact, you did
> go further and to many different people in many different places."  I said "yes, I
> did, Michael.  Once Lucy came to me and asked me for my help as her supervisor,
> I definitely did contact other people, but not 'many' other people."

*Id.*  Dr. Clemmons expressed concern that "the recent incident with Lucy's benefits has seriously

damaged what had already been a fairly tense professional relationship between Michael and

me," and said that she would leave the situation for Mr. Beadle to deal with unless "another

incident occur[ed]" of "being unfairly treated by Michael as a result of [her] raising the Lucy's

benefits [issue] with HR and with [Mr. Beadle]." *Id.*; *see also* SDF ¶ 39 ("Contrary to Kaplan's wishes, Clemmons sought advice from AED's HR department regarding Shillingi's [discrimination] complaint . . . ."); Pl.'s Resp. to Def.'s Interrog. No. 16, Def.'s Ex. O-111 (alleging that "soon after [Mr. Kaplan] learned that I had raised Ms. Shillingi's complaint of national origin discrimination to HR and Mr. Beadle . . ., Mr. Kaplan described" Dr. Clemmons as "disingenuous, manipulative and not direct"). At the end of the call with Mr. Kaplan, Dr. Clemmons expressed concern that he might not be able to support her in an upcoming conference call, so Mr. Kaplan suggested that Mr. Beadle participate in the call and assist in managing Dr. Clemmons, which she believed were good ideas. Def.'s Ex. O-8 at 52–53.

Dr. Clemmons contends that the Court erred by failing to infer, based on these facts, that the mobbing was so severe or pervasive that it caused Mr. Kaplan to reverse course, going from vigorously defending Dr. Clemmons in October 2007 from those who rushed to accuse her to agreeing with her detractors in February 2008. Dr. Clemmons is undoubtedly correct that at the summary judgment stage, the Court was required to draw all *reasonable* inferences in her favor. *See Grosdidier v. Broad. Bd. Of Governors, Chairman*, 709 F.3d 19, 23–24 (D.C. Cir. 2013). But the inference that Dr. Clemmons would have the Court draw based on the evidence at hand is, according to that same evidence, unreasonable. Mr. Kaplan and Dr. Clemmons both credited his change in viewpoint not to GSCP's effective or repetitive workplace mobbing, but to the fact that Dr. Clemmons went against Mr. Kaplan's wishes and raised a complaint against him when she had told him previously that she would not intervene in the matter. Neither her opposition to AED's motion for summary judgment nor her motion to alter or amend judgment point to any facts that would suggest that mobbing—and not the complaint Dr. Clemmons raised—could reasonably be blamed for Mr. Kaplan's change in opinion about Dr. Clemmons.

Moreover, even if the evidence did show that Mr. Kaplan came to view Dr. Clemmons as disingenuous and manipulative because of the GSCP staff's mobbing efforts—and he shocked or offended her by telling her so on one occasion—it would still not be sufficient to demonstrate that the alleged mobbing was sufficiently severe or pervasive to alter the conditions of Dr. Clemmons's employment, particularly when Mr. Kaplan immediately arranged for her to have a supportive presence on an upcoming conference call and arranged for Mr. Beadle to take over as her supervisor.  In short, even if the mobbing was successful enough to cause Dr. Clemmons's supervisor to describe her unfavorably in a phone conversation, such criticism still leaves Dr. Clemmons well short of showing severe or pervasive harassment that is actionable under Title VII and the DCHRA.  *See Dudley v. Washington Metro. Area Transit Auth.*, 924 F. Supp. 2d 141, 171–72 (D.D.C. 2013) ("A litany of cases shows that simply having a rude, harsh, or unfair boss is not enough for a hostile work environment claim."); *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (affirming finding of no actionable hostile work environment where defendant yelled, used profanity, threatened arrest, and described plaintiff's work as "bullshit"); *Freedman v. MCI Telecomm. Corp.,* 255 F.3d 840, 848 (D.C. Cir. 2001) (finding supervisor's "nasty attitude" insufficient to establish a hostile work environment).

The same is true of Dr. Clemmons's allegations pertaining to Ms. Moskov of USAID. Although one could certainly imagine a scenario in which harassment could be severe or pervasive because it harmed an employee's working relationship with a client – for example, if the client withdrew or decreased its business with that employee, or if the employer terminated the employee for damaging client relationships – this is not such a case.  Dr. Clemmons simply has not shown that the fact that Ms. Moskov once criticized Dr. Clemmons in a meeting in January 2009 after having praised her in an email in August 2007 could be viewed as altering the

terms or conditions of her employment.  Courts have repeatedly explained that such work-related

criticism, even if unjustified, is one of the ordinary tribulations of the workplace that Title VII

simply does not address.  *See, e.g., McCaskill v. Gallaudet Univ.*, 36 F. Supp. 3d 145, 155–56

(D.D.C. 2014) (finding allegations of "verbal abuse, condescension, and castigation" at

meetings, expressions of disgust, a threatening letter, and statements delivered with "an

aggressive demeanor, a hostile tone, a scowl . . ., and overly dramatic signing" did not establish a

claim of severe or pervasive harassment); *Holmes–Martin v. Sebelius*, 693 F. Supp. 2d 141, 165–

66 (D.D.C. 2010) (finding claim that plaintiff was publicly criticized, received unwarranted

criticism in performance evaluations, given reduced job responsibilities, excluded from

meetings, and received unrealistic deadlines were not sufficiently severe or pervasive to support

a hostile work environment claim); *Badibanga v. Howard Univ. Hosp.*, 679 F. Supp. 2d 99, 104

(D.D.C. 2010) (dismissing hostile work environment claim where plaintiff was placed on

administrative leave due to a false accusation); *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 78–81

(D.D.C. 2007) (finding allegations that plaintiff's harassers "undermined his authority within the

FBI and with the Saudi government and cut him out of the chain of command are . . . insufficient

to support a hostile work environment claim"); *Richard v. Bell Atl. Corp.,* 209 F. Supp. 2d 23, 35

(D.D.C. 2002) (noting that the "the type of conduct that [the plaintiff] complain[ed] of, i.e., rude

comments, unjust criticism, and stressful working conditions, amount to 'ordinary tribulations of

the workplace' that are insufficient as a matter of law for a hostile [work] environment case").[6]

---

[6] *See also Quarless v. Bronx Leb. Hosp. Ctr.*, 75 F. App'x 846, 848 (2d Cir. 2003)
(upholding dismissal of hostile work environment claim based on allegations that plaintiff was
"shunned, kept away from meetings he usually attended, and his authority was undermined");
*Patterson v. Johnson*, 391 F. Supp. 2d 140, 146 (D.D.C. 2005) (alleged incidents in which
plaintiff's authority was "undermined" did not rise to the level of a hostile work environment);
*Bergin v. N. Clackamas Sch. Dist.*, No. 03–cv-1412, 2005 WL 66069, at * 19 (D. Or. Jan. 12,

In short, Title VII and the DCHRA are not "general civility code[s]" that permit recovery for "ordinary tribulations of the workplace." *See Faragher*, 524 U.S. at 788 (citations and quotations omitted). Dr. Clemmons's workplace may well have been unpleasant and unprofessional at times, and various individuals may not have held Dr. Clemmons in high esteem, but those facts are not enough to render it a hostile work environment as a matter of law.[7]

As a final matter, Dr. Clemmons argues that the Court erred by ignoring the portion of her HR grievance that said she felt "physically ill from the hostility and emotional abuse that I have experienced during the past year, and from the negative impact this . . . situation has had on my project's ability to achieve its full potential."[8] Pl.'s Mot. Alter Jdgmt. at 10–12 (quoting Def.'s Ex. O-1). Dr. Clemmons cited this same fact in her summary judgment briefing to

---

2005) ("shunning and humiliation" by co-workers, though "pervasive and continuous," was not sufficient to support a hostile work environment claim).

[7] Dr. Clemmons also criticizes the Court for ignoring Ms. Larsen's email to Ms. McCown, stating that "Lydia and Lucy Shillingi[']s name is mud around" AED headquarters, Pl.'s Ex. H-197, ECF No. 68–11, but she fails to note that the email was sent in November 2009, long after Dr. Clemmons had left AED. The same is true of the negative reference that Ms. Moskov provided upon a potential employer's request in 2011; it occurred years after Dr. Clemmons left her employment with AED, *see* SDF ¶¶ 210–11, and thus could not have contributed to a hostile work environment during the time that she was employed. *See Hutchinson v. Holder*, 815 F. Supp. 2d 303, 321–23 (D.D.C. 2011) ("Conduct that Plaintiff did not know about [while she was employed] . . . cannot be used to establish that she was subjected to a hostile work environment."). Also of note is the fact that despite the negative reference from Ms. Moskov, Dr. Clemmons was still offered the job with the USAID-funded project. SDF ¶¶ 211–12.

[8] Whether harassment "unreasonably interferes with an employee's work performance" is an appropriate factor for the Court to consider when assessing its severity or pervasiveness. *Faragher*, 524 U.S. at 788 (internal quotation marks omitted). But Dr. Clemmons's unsworn assertion about an unspecified "negative impact" on her "project's ability to achieve its full potential," without more, is insufficient to show that her work was unreasonably interfered with as a result of the mobbing, particularly when considered alongside the undisputed fact that she continued to receive the highest possible performance ratings throughout her time at AED. *See* Def.'s Ex. O-90.

"show[] that Clemmons meets the subjective test for a hostile work environment." Pl.'s Mem. Opp'n Mot. Summ. J. at 25. But this Court never reached – or needed to reach – the issue of whether Dr. Clemmons found her work environment at AED to be subjectively offensive. "In order to be actionable under [Title VII], a[n] . . . objectionable environment must be *both* objectively *and* subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787 (emphasis added). Dr. Clemmons thus cannot point to evidence that her work environment was subjectively offensive to compensate for her insufficient showing of objective offensiveness.

In sum, although Dr. Clemmons argues that the Court ignored evidence showing that the mobbing was severe or pervasive, when considered collectively, her allegations of workplace criticisms, gossip, rudeness, and subjective changes in perception are simply insufficient to establish an objectively hostile work environment under Title VII and the DCHRA. The Court's holding to this effect did not constitute clear error.

### 2. The Court's Consideration of Evidence that the Alleged Harassment was Race-Based

Dr. Clemmons next contends that the Court clearly erred by ignoring evidence that the workplace mobbing was race-based. Pl.'s Mot. Alter Jdgmt. at 13–14. She points to Ms. McClintock's handwritten interview notes, which appear to show that Mr. Beadle told her it "may be racial, as well," and to Mr. Beadle's email criticizing Ms. Nachbar for sending the July 2008 email, which he characterized as jumping to a "public lynching" of Dr. Clemmons. *Id.*

Dr. Clemmons is mistaken. The Court considered both that Mr. Beadle observed that the harassment may have had a racial component, *see Clemmons*, 2014 WL 4851739, at *8–10, and that he sent an email condemning Ms. Nachbar for the "public lynching," *see id.* at *3–4; *see also id.* at *21. More to the point, however, the Court expressly declined to decide whether the

alleged harassment was race-based, because to do so was unnecessary in light of the fact that Dr.

Clemmons failed to establish a genuine dispute of material fact regarding whether the

harassment was severe or pervasive. *See id.* at *10–12. Dr. Clemmons suggests that this

"contributed to the Court's error," because the fact that she and others thought the harassment

"was or could be racial" contributed to making the harassment "utterly demoralizing" for her.

*See* Pl.'s Mot. Alter Jdgmt. at 11. What Dr. Clemmons fails to recognize, though, is that "[n]ot

all abusive behavior, even when it is motivated by discriminatory animus, is actionable."

*Barbour v. Browner*, 181 F.3d 1342, 1347 (D.C. Cir. 1999). To be actionable, the harassment of

Dr. Clemmons must have been *both* race-based *and* severe or pervasive. Here, the evidence of

racial animus is less than abundant, and the alleged acts of hostility do not include any racial

slurs or similar language. Even assuming that the mobbing was motivated by racial animus,

however, it simply does not rise to the level of *extreme* behavior that is actionable under Title

VII and the DCHRA. *See Faragher*, 524 U.S. at 788 ("[C]onduct must be extreme to amount to

a change in the terms and conditions of employment.").

### 3. The Court's Use of Case Law

Dr. Clemmons's final claim of error relating to the Court's hostile work environment

analysis centers on the Court's finding that her "complaints about GSCP staff sending rude

emails, rolling their eyes at her in meetings, and allegedly spreading false rumors about her"

were not sufficiently severe or pervasive to create an actionable hostile work environment.

*Clemmons*, 2014 WL 4851739, at *11. She argues that this portion of the Court's analysis relied

on inapplicable case law, and that the Court erred by requiring her to demonstrate an "adverse

employment action" that had "tangible consequences."

Dr. Clemmons correctly points out that a plaintiff need not produce "evidence of any tangible consequences to her employment conditions," in order to establish an actionable hostile work environment claim.  Pl.'s Mot. Alter Jdgmt. at 12 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–16 (2002)).  She is incorrect, however, in suggesting that this Court held her to such a requirement.  The Court did observe that "this Court has rejected hostile work environment claims under similar situations in which 'none of the instances alleged amount to objective harm with tangible workplace consequences," *Clemmons*, 2014 WL 4851739, at *12 (quoting *Morrison v. Mills*, 928 F. Supp. 2d 241, 249–50 (D.D.C. 2013)), and went on to observe that Dr. Clemmons had provided "no evidence of any *tangible* consequences to her employment conditions, but rather only a discrete set of events that 'though annoying and inconvenient, do not constitute a materially adverse action.'"  *Id.*  But this was not an improper consideration.  Indeed, the D.C. Circuit Court has made clear that whether harassment lacked any tangible consequences for the employee is an appropriate factor for a court to consider when assessing whether the harassment is severe or pervasive.  *See Baloch*, 550 F.3d at 1201 (holding that "disciplinary actions and workplace conflicts were not so 'severe' or 'pervasive' as to have changed the conditions of [plaintiff's] employment" where, among other things, "[h]is claims of harm are not supported by evidence of tangible workplace consequences, whether financial, physical, or professional").

As for Dr. Clemmons's claim that the Court relied on inapplicable cases in assessing the severity of the harassment in question, it is true that *Forkkio v. Powell*, 306 F.3d 1127 (D.C. Cir. 2002), and *Bridgeforth v. Jewell*, 721 F.3d 661 (D.C. Cir. 2013) analyzed claims of discrimination and retaliation but not hostile work environment claims.  And the Court's reference to the cases' "adverse employment actions" language, a phrase typically used in

discrete-act discrimination analysis, may have introduced unnecessary confusion.  Nevertheless, the Memorandum Opinion makes clear that it used *Forkkio*'s "adverse employment action" language as a synonym for harassment so severe or pervasive that it affected the "terms, conditions, or privileges of employment."  *See Clemmons*, 2014 WL 4851739, at *11.  Similarly, the Court cited *Bridgeforth* for the undisputed proposition that "not everything that makes an employee unhappy" is actionable under Title VII.  *Id.* at *12 (quoting *Bridgeforth*, 721 F.3d at 663).  The Court went on to explain that while the mobbing was doubtlessly annoying, "the events Dr. Clemmons endured were not sufficiently severe or pervasive to establish a hostile work environment claim."  *Id*.  This finding was supported by citations to several analogous hostile work environment cases in which the alleged forms of harassment – ranging from false accusations to inappropriate comments to public humiliation, screaming, hostile criticism, exclusion, and disrespect – were found to be insufficiently severe or pervasive.  *Id.* at *11–12 (citing *Saba v. U.S. Dep't of Agric.*, 26 F. Supp. 3d 16, 26 (D.D.C. 2014); *Morrison v. Mills*, 928 F. Supp. 2d 241, 249–50 (D.D.C. 2013); *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 98 (D.D.C. 2007); *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 54–57 (D.D.C. 2004)).

Dr. Clemmons may not agree that the alleged acts of harassment in these hostile work environment cases are comparable in severity and pervasiveness to those that she has alleged, but such disagreement with the Court does not amount to the establishment of clear error warranting relief under Rule 59.  *See Horizon Lines, LLC v. United States*, 429 F. Supp. 2d 92, 97 (D.D.C. 2006) (holding that where a party "merely disagrees with how the Court weighed the facts and interpreted the case law . . . [s]uch . . . disagreement provides no basis for the Court to reconsider its decision").

In sum, the Court committed no clear error of law or fact in finding that the alleged mobbing of Dr. Clemmons was not sufficiently severe or pervasive to support her hostile work environment claim and in granting summary judgment in favor of AED.

### B.  The Court's Analysis of Dr. Clemmons's Retaliation Claims

Dr. Clemmons's opposition to AED's motion for summary judgment argued that she had experienced retaliation on four occasions: (1) when Mr. Beadle threatened her with a poor review if she filed an HR grievance, (2) when she was awarded the lowest possible raise, (3) when she had to report to Ms. Nachbar after receiving $500,000 in GSCP funds, and (4) when she was advanced six days of paid leave instead of fourteen.  The Court granted summary judgment to AED in part because the acts alleged by Dr. Clemmons were not materially adverse, and in part because Dr. Clemmons failed to cast doubt on AED's non-retaliatory explanations for its actions.  In her motion to alter or amend judgment, Dr. Clemmons argues that the Court erred by granting summary judgment to AED as to her retaliation claim because each of the four acts she identified as the basis for her claim constituted a retaliatory, materially adverse action.  Pl.'s Mot. Alter Jdgmt. at 15–20.

### 1.  Mr. Beadle's "Threat"

Beginning with Mr. Beadle's "threat," Dr. Clemmons asserts that the Court erred in finding that his statement could not support a claim of retaliation because "the Court wrongly conflated this case" with *Gaujacq v. EDF, Inc.*, 601 F.3d 565 (D.C. Cir. 2010), which held that a reasonable worker would have understood the statement "your career is dead . . . if you file the claim" in the context of the discussion to be an expression of exasperation rather than a threat of retaliation, *id.* at 578.  *See* Pl.'s Mot. Alter Jdgmt. at 16.  She argues that *Gaujacq* is factually distinguishable, because in that case, the remark was fleeting and the threat was never realized,

and the company was supportive of the plaintiff.  Here, in contrast, the statement was

documented in an email, and she alleges that she did lose Mr. Beadle's support.

Once again, Dr. Clemmons is seeking to stretch Rule 59(e) beyond its limitations.  Her

disagreement with the Court's finding that the facts in *Gaujacq* are analogous and that no

reasonable worker would have viewed Mr. Beadle's statement in context as a threat of retaliation

is simply not a sufficient basis for altering or amending a final judgment of this Court.  *See*

*Horizon Lines, LLC*, 429 F. Supp. 2d at 97.  Additionally, Dr. Clemmons's efforts to distinguish

her case ignore material similarities between her case and *Gaujacq*.  In *Gaujacq*, the court

explained that the plaintiff was speaking to a company executive who did not want to hear her

"complain again about her situation . . . given all that the company had done for her," and that

his statement that her "career is dead in [the company] if you file the claim . . . appears less a

threat than an expression of exasperation over [the plaintiff's] ongoing antics," particularly in

light of the fact that the company executive had already "spent so much time earlier in the year

negotiating with [the plaintiff] in an effort to" accommodate her.  *Gaujacq*, 601 F.3d at 578

(holding that the "threat" by the company executive "did not constitute a materially adverse

action").  The court so held despite the fact that the plaintiff's employer allowed her contract to

expire and subsequently terminated her when she refused to accept reassignment.  *Id.* at 577–78.

The full text of the September 2008 email exchange between Dr. Clemmons, Ms. Mayo,

and Mr. Beadle—who had devoted substantial time and effort to supporting Dr. Clemmons after

the July 2008 email and to proving that the accusations against her were unsupported—reveals a

situation closely analogous to that of *Gaujacq*.  Despite Mr. Beadle's efforts—for which Dr.

Clemmons thanked him profusely— and despite Dr. Clemmons's own understanding that filing a

grievance with HR would mean "a management headache for [Mr. Beadle], and . . . a major

drain on [her] as [she had] a million other very important things [she] should be focusing on

within SHARP," Dr. Clemmons nevertheless told Mr. Beadle that she planned to file a complaint

with HR.  Def.'s Ex. O-78.  Mr. Beadle responded roughly thirty minutes later by acknowledging

that the situation had been upsetting, but stating that:

> [I]t was handled and is over.  I do not support you taking this to HR.  I have
> shared everything with you, as to processes and outcomes.  As I mentioned, the
> issue has no bearing whatsoever on how we . . . view your performance . . . .  If
> you do a good job, and the project accomplishes its deliverables, then everything
> will be fine.  If you pursue this, it will only create worse feelings between you and
> GSCP, and will most definitely make the situation worse.  It will swallow your
> time and make you less productive . . . which will have a direct impact on your
> performance and my view and review of your work.  As far as I am concerned,
> this is over.  If you wish to pursue it, you do so alone and without my support.

*Id.*  This message was echoed the following day by Ms. Mayo, who wrote that "Frank and I fully

support you," and that she "agree[d] with Frank in his advice and hope[d] that [Dr. Clemmons

could] take a step back and know that as stressful as this incident has been, [they had] complete

faith and fully support[ed] [her] professional standing here at AED."  *Id.*

      In context, it is clear that Mr. Beadle's statement that he would not support Dr.

Clemmons in her efforts to raise her complaint with HR was an expression of frustration that she

continued to pursue the issue despite the fact that several months had passed and he had

personally dedicated substantial efforts to investigating the situation, resolving it, and supporting

Dr. Clemmons.  Moreover, his warning that the complaint process could consume her time and

negatively affect her performance review mirrors Dr. Clemmons's own stated concerns about the

complaint process being a "major drain" on her time when she should have been focused on "a

million other very important things . . . within SHARP."  *See id.*  A reasonable employee would

not have understood Mr. Beadle's statements, in context, as a threat of retaliation, and the

statements— which never resulted in a negatively impacted performance evaluation—were thus

not materially adverse.  *Cf. Cole v. Boeing Co.*, No. 11-cv-1494, 2014 WL 5795124, at *3, 8

(D.D.C. Nov. 7, 2014) (holding that negative email response to plaintiff's suggestion of suing her employer, which said "DO NOT SUE while you are on this contract.  I am fairly certain that [defendant and] others above me would not look favorably upon that," was not materially adverse action when considered in context).  Thus, Dr. Clemmons has failed to establish clear error in the Court's reliance on *Gaujacq*.

## 2.  Award of the Lowest Possible Raise

Next, Dr. Clemmons argues that the Court erred by failing to find that Mr. Beadle's decision to award her the lowest possible raise for someone with her salary and performance rating was a materially adverse action.  She claims that the Court improperly required her to identify a similarly-situated person who received more favorable treatment, and she provides new evidence to show that AED did, in fact, treat others more favorably when awarding raises.  Pl.'s Mot. Alter Jdmt. at 17–18.

Dr. Clemmons again misconstrues the Court's analysis and the parameters of Rule 59(e).  As to the former, the Court did not require Dr. Clemmons to prove that similarly-situated individuals received higher raises.  The Court recognized that "a lower than expected raise or bonus" might constitute an actionable adverse action if awarded "for discriminatory or retaliatory reasons," but that AED had asserted legitimate, non-retaliatory reasons for the amount of the raise, and Dr. Clemmons did not produce "sufficient evidence to discredit those legitimate reasons and show that the raise was retaliatory."  *Clemmons*, 2014 WL 4851739, at *14.  The Court explained that Dr. Clemmons "does not, for example, point to another similarly situated employee of the same pay grade who did *not* receive the minimum salary increase in 2008, nor does she offer evidence to contradict AED's asserted rationale."  *Id.*  The Court correctly recognized that evidence of others who were treated more favorably was one of multiple ways

that Dr. Clemmons could have cast doubt on AED's explanation for her raise; it did not suggest that it was the only method for doing so.

Dr. Clemmons next argues that she has evidence that others at AED did, in fact, receive above-minimum raises, and she invites the Court to amend its judgment on the basis of this evidence. Pl.'s Mot. Alter Jdgmt. at 17–18. While a Rule 59(e) motion may be granted based on the availability of new evidence, "new evidence" is evidence that "was not previously available," not simply evidence that was not previously presented. *See Messina v. Krakower*, 439 F.3d 755, 758–59 (D.C. Cir. 2006). Dr. Clemmons does not suggest that the evidence in question was not previously available to her, and she has not offered any explanation for her failure to present it prior to the Court's entry of judgment. Accordingly, the "new evidence" regarding other AED employees' salary increases is not a proper basis for altering or amending judgment, and the Court will not consider it. *See Exxon Shipping Co.*, 554 U.S. at 485 n.5 (holding that a Rule 59(e) motion "may not be used to . . . raise arguments or present evidence that could have been raised prior to the entry of judgment." (citations omitted)).

### 3. Authorization of Six Days of Advance Leave

Dr. Clemmons next argues that the Court committed a series of errors in finding that the decision to advance her six days of leave instead of fourteen was not a materially adverse action. Pl.'s Mot. Alter Jdgmt. at 19–20. The Court found that Dr. Clemmons had a negative leave balance at the time of her request, that she nevertheless received an advance of six days of leave that she had yet to earn, and that even if that decision could be considered materially adverse, she failed to cast doubt on AED's legitimate and non-retaliatory explanation that her request was decided in accordance with company policy. *Clemmons*, 2014 WL 4851739, at *15. Dr. Clemmons, however, argues that the Court erred by failing to consider the fact that her contract

did not allow her to take leave during the project's final months, meaning that she would lose any time she did not take in advance and that the action was materially adverse.  Pl.'s Mot. Alter Jdgmt. at 19.  She also argues that the Court erred in crediting AED's non-retaliatory explanation for the denial because: (1) she should not have been required to provide proof of comparators to show discrimination, and (2) the Court ignored evidence that corroborated her belief that Mr. Beadle's decision to deny the full leave request was unusual.  *Id.*

Even if the Court accepted Dr. Clemmons's argument that the decision to advance six days of leave was materially adverse, however, she has failed to show clear error in the Court's finding that she failed to cast doubt on AED's non-retaliatory explanation for the leave decision. Once again, the Court's observation that "there is no evidence that anyone else received more [leave] under those circumstances," does not suggest that such evidence was required; rather, it describes only one possible method of demonstrating pretext that Dr. Clemmons could have— but did not—use.  *See Clemmons*, 2014 WL 4851739, at *14.  And Dr. Clemmons's argument that the Court failed to consider evidence that the decision was unusual is unfounded.  The Court explicitly addressed Dr. Clemmons's assertion that the situation was unusual because Ms. Mayo initially approved the full leave request only to have Mr. Beadle intervene, and found that her assertion was unsupported by the record.  *Id.*; *see also Exxon Shipping Co.*, 554 U.S. at 485 n.5 (explaining that "Rule 59 does not permit a dissatisfied party 'to relitigate old matters'").

In fact, Ms. Mayo explained that although she typically had "carte blanche" from Mr. Beadle to approve leave requests as she saw fit, that discretion did not extend to situations like Dr. Clemmons's where an employee had a negative leave balance at the time of the request. Mayo Dep. 306:6–307:6 (explaining that she "didn't have the authority" to make decisions for employees with negative leave balances).  As a result, she forwarded Dr. Clemmons's leave

request to Dan White for review, and Mr. White – not Mr. Beadle – recommended that Dr.

Clemmons receive an advance of six days rather than the requested fourteen because that was the

amount of leave that she would accrue in the next quarter.  *Id.* at 303:7–306:3; Def.'s Ex. O-86.

The Court's finding that Dr. Clemmons failed to cast doubt on AED's legitimate, non-retaliatory

explanation for the leave decision is thus properly supported by the summary judgment record

and is not the product of clear error.

### 4. Reporting Requirement for $500,000 in Funding

Dr. Clemmons's last claim of error pertaining to the Court's retaliation analysis posits

that the Court ignored favorable evidence when finding that the requirement that she report to

Ms. Nachbar in exchange for receiving $500,000 in funding was not a materially adverse action.

Specifically, she argues that the Court erred by relying on her email that characterized the

reporting as something intended to be a "10 minute effort," and by failing to consider her

verified answer to interrogatory number 19, which asserted that the reporting requirement kept

her and her staff in the office seven days a week for fifteen or sixteen hours a day.[9]  Pl.'s Resp.

to Def.'s Interrog. No. 19, Def.'s Ex. O-111.

Dr. Clemmons is correct; the Court's finding that the reporting requirement was not

materially adverse did not take into account the hours of effort reported in her answer to

---

[9] Dr. Clemmons also argues that the Court erred by failing to consider the fact that Ms.
Larsen did not include her on a phone call she had with Peter Wondergem of USAID on
December 11, 2008, regarding the funds transfer.  *See* Pl.'s Mot. Alter Jdgmt. at 19.  She does
not, however, explain how this fact bears on the material adversity of the funds transfer,
implying only that it pertains to her relationship with USAID in some unspecified manner.  *See
id.*  She does not allege that Ms. Larsen badmouthed her on the call to USAID, or that the call in
any way prevented her from doing her job.  More significantly, she made no such argument in
her brief in opposition to AED's motion for summary judgment, and the Court will not consider
it now.  *See Exxon Shipping Co.*, 554 U.S. at 485 n.5 (holding that Rule 59(e) cannot be used "to
raise arguments . . . that could have been raised prior to the entry of judgment" (citations
omitted)).

interrogatory 19.  This is largely attributable to the fact that Dr. Clemmons's summary judgment brief made no mention of those hours or the answer in question, arguing only that "the reports themselves were busy work."  *See* Pl.'s Mot. Opp'n Def.'s Mot. Summ. J. at 36.  But her 41-page statement of disputed facts, which she filed alongside her opposition brief, did include at least a citation to her answer to interrogatory number 19 alongside the assertion that the monthly reporting requirement "created a significant amount of additional work for the SHARP team, and especially for Clemmons and Ms. Shillingi."  SDF ¶ 145.  Thus, although the Court would have hoped that a fact so central to Dr. Clemmons's retaliation claim would have been raised more directly—particularly in light of the fact that the parties' summary judgment filings alone well exceeded 2,000 pages—the Court will credit Dr. Clemmons for having raised the issue prior to the entry of judgment.  And giving due credit to Dr. Clemmons's statement that the reporting requirement caused her to "often work seven days a week and 15-16 hour days," the Court must vacate its prior finding that the reports constituted mere "busy work" and the type of "minor inconveniences and alteration of job responsibilities [that] do not rise to the level of an adverse action."  *Clemmons*, 2014 WL 4851739, at *16 (quoting *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009)).

This does not end the matter, however, as the Court must now consider AED's additional argument in favor of summary judgment that the Court did not previously address: the assertion that Dr. Clemmons's retaliation claims must fail because she did not oppose a practice prohibited by Title VII or the DCHRA.  *See id.* at *12 n.5 (explaining that the Court would not reach the issue of whether the mobbing grievance constituted opposing a discriminatory practice because the Court was granting summary judgment on other grounds).

In its motion for summary judgment, AED argues that Dr. Clemmons's grievance "complained exclusively of workplace mobbing and other unprofessional behavior wholly unrelated to her race," and she "never mentioned the word 'race' in her written grievance or during AED's corresponding investigation, nor did she otherwise characterize the workplace mobbing in terms of race." Def.'s Mem. Support Mot. Summ. J. at 37. Thus, AED contends, because Dr. Clemmons did not complain of race discrimination prior to the alleged acts of retaliation, she did not engage in protected activity and could not have been retaliated against for having done so.

Dr. Clemmons, in opposition, argues that she "engaged in protected activity by filing the mobbing grievance and participating in the investigation." Pl.'s Opp'n to Def.'s Mot. Summ. J. at 33. She notes that the opposition clause of Title VII is broadly construed, and that even though her grievance did not expressly invoke race discrimination, she "used many words that are somewhat magical" like "diversity," "bias," "prejudice," and "harassment." Id. at 34. She also points out that during the course of the investigation, she confirmed that Ms. McClintock knew that she was African-American and that Ms. Larsen and Ms. McCown were Caucasian, and Ms. Mayo and Mr. Beadle both told Ms. McClintock that they believed race may have been a factor in the mobbing. Id. at 34–35. "For all of these reasons," Dr. Clemmons concludes, she "engaged in protected activity beginning September 2, 2008, when she told Beadle and Mayo she intended to file a complaint . . . through January 15, 2009, when she invoked race very specifically." Id. at 35.

To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that she engaged in a protected activity and that her employer took materially adverse action against her because she engaged in that protected activity. *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C.

Cir. 2013).  Once an employer has come forward with a legitimate, non-retaliatory explanation

for its action, "'the central question on summary judgment is whether the employee produced

sufficient evidence for a reasonable jury to find that the employer's asserted [non-retaliatory]

reason was not the actual reason and that the employer intentionally . . . retaliated against the

employee' for engaging in a protected activity."  *Hunter v. District of Columbia*, 905 F. Supp. 2d

364, 378 (D.D.C. 2012) (quoting *Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011)).

Title VII's anti-retaliation provision prohibits an employer from discriminating against an

employee because the employee "'opposed any practice' made unlawful by Title VII or 'made a

charge, testified, assisted, or participated in' a Title VII proceeding or investigation."  *Manuel v.

Potter*, 685 F. Supp. 2d 46, 65 (D.D.C. 2010) (citing 42 U.S.C. §2000e-3(a); *Burlington N. &

Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  Although the opposition clause is

undoubtedly broad, it is not limitless, and "[n]ot every complaint garners its author protection

under Title VII."  *Broderick v. Donaldson,* 437 F.3d 1226, 1232 (D.C. Cir. 2006).  For example,

"ambiguous complaints that do not make the employer aware of alleged discriminatory

misconduct do not constitute protected activity."  *Int'l Healthcare Exch., Inc. v. Global

Healthcare Exch., LLC,* 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007).  "While no 'magic words'

are required" for an employee's grievance to constitute protected activity, it "must in some way

allege unlawful discrimination, not just frustrated ambition."  *Broderick,* 437 F.3d at 1232

(expressing doubt as to whether employee's memo to supervisors and the equal employment

opportunity office qualified as protected activity where she complained of "embarrassing,

humiliating, and downright insulting" behavior and "incidentally mentioned her previous [sexual

harassment] lawsuit," but did not explicitly allege that she was being discriminated against).

A close examination of Dr. Clemmons's grievance, as well as of her September 2, 2008 email stating that she planned to file a grievance and her discussions with Ms. McClintock during the course of the HR investigation, reveals that her grievance and related statements do not constitute protected activity under Title VII or the DCHRA because they did not allege unlawful race discrimination.[10]  In her September 2008 email—which makes no explicit reference to discrimination on the basis of race—Dr. Clemmons informed Mr. Beadle and Ms. Mayo that while she appreciated Mr. Beadle's investigation into the July 2008 allegations of unprofessional conduct, after hearing that Ms. Larsen disputed the results of his investigation and that Ms. Nachbar's email had suggested that she be fired, she felt she had to raise the issue with human resources.  *See* Def.'s Ex. O-78.  She did so on October 7, 2008, in a grievance that read, in pertinent part, as follows:

> I am writing to make a formal grievance and to request an investigation by your department on a form of harassment that I am going to call "work place mobbing" for lack of a better term.  Although I have not found anything in AED's policies on harassment that fits my situation, I have . . . found . . . a few definitions of work place mobbing as follows: . . . "You are being mobbed when colleagues attack your dignity, integrity and competence over a period of months or years. . . . Such relentless persecution is often fueled by envy, suspicion, gossip and innuendo . . . . [and is] a particular type of bullying that is not as apparent as most . . . ."

> For over a year, I have been subjected to work place mobbing as defined above. . . .  As with any form of harassment or discrimination, one of the most terrible things about work place mobbing is that it is often hard to prove. . . .  Nancy's July email . . . brings out into the open . . . a malicious and underhanded pattern of gossip and innuendos by members of the GSCP[] team that have been targeting me for over a year.

---

[10] Although the record includes references to other, earlier actions that could perhaps constitute protected activity, the Court limits its analysis to those acts that Dr. Clemmons's summary judgment brief identifies as the protected activity for which she was retaliated against.  "The court's role is not to act as an advocate for the plaintiff and construct legal arguments on [her] behalf in order to counter those in" a dispositive motion.  *Stephenson v. Cox*, 223 F. Supp. 2d 119, 122 (D.D.C. 2002).

> I have found the entire experience – from the disrespect and the professional
> scapegoat-ing and bullying, to the endless innuendos and inquiries, to the steady
> undermining of my role and performance as COP, to the absence of a
> Management response that sufficiently addresses the root causes of all these
> things – to be bewildering, humiliating, and immensely distressful . . . I believe
> that the actions of the GSCP[] team have been dishonest and mean-spirited. They
> have conducted an intensive, highly personal, and prejudicial campaign against
> me with a clear goal of forcing me out of my employment with AED while
> covering up shortcomings within their own team. I am dismayed that such a work
> environment can persist within AED at the very time when the Senior Executive
> levels of AED's management are in the midst of vigorously promoting and
> institutionalizing leadership, integrity, and valuing diversity as part of our
> organizational culture. . . .
>
> Enough is enough. The work situation has been hostile for over a year . . . [and]
> there has been a recommendation to fire me based on personal motives and pure
> prejudice. It's time for Human Resources to intervene.

Def.'s Ex. O-1. Notably, the fact that the grievance makes no mention of race was a conscious

choice on Dr. Clemmons's part; she intentionally removed explicit references to race from her

mobbing grievance before sending it to HR. *See* Clemmons Dep. 310:4–312:11 (explaining that

although she has used the word "race" in earlier drafts, she chose to delete the word from the

final draft that she sent to HR).

In a follow-up email to Ms. McClintock on October 14, Dr. Clemmons provided a

selection of emails "that cover some of the key points" that she had discussed with Ms.

McClintock and raised in her grievance, including technical problems with GSCP and the

allegations against her. Def.'s Ex. O-8. She did not mention race or race discrimination in that

email. *See id.* Dr. Clemmons then emailed Ms. McClintock again on October 21 to "help to

complete some gaps in the documentation [she had] provided," and specifically to provide emails

that "document the concerns regarding the lack of available technical expertise in GSCP." Def.'s

Ex. O-9. She further explained that she believed that "what began to happen, and *what triggered*

*the mobbing, was that GSCP[] somehow decided to try to cover up their gaps in technical*

*expertise* rather than address them, and to go on the offensive, labeling me with some of the

terms I describe (i.e., trouble-maker, patronizing, not a team player, etc.)." *Id.* (emphasis added). According to Dr. Clemmons, she also spoke with Ms. McClintock at some point during the investigation over the phone, and she asked if Ms. McClintock knew that she was African-American and Ms. Larsen, Ms. McCown, and Ms. Nachbar were Caucasian. Clemmons Dep. 141:11–16. Not until her January 15, 2009 email, however, did Dr. Clemmons explicitly tell Ms. McClintock that she believed the mobbing was occurring because of her race. *See* Def.'s Ex. O-29 ("Recent events have confirmed that the retaliation, as well as the workplace mobbing, are based on discrimination and unfair treatment based on race.").

Nothing in Dr. Clemmons's September 2008 email, her October 2008 grievance, or her statements to Ms. McClintock in the course of the investigation prior to January 15, 2009, show that she alleged unlawful race discrimination, and not simply unprofessional conduct perpetrated by underqualified or jealous co-workers attempting to cover up their own deficiencies. Although Dr. Clemmons may have honestly believed that the mobbing was race-based, absent any indication that she communicated this belief to AED in her grievance or during the investigation, she has failed to show that either her mobbing grievance or her participation in the ensuing investigation constituted protected activity. *See Broderick*, 437 F.3d at 1232 ("complaining about being 'picked on,' without mentioning discrimination or otherwise indicating that gender was an issue, does not constitute protected activity, even if the employee honestly believes she is the subject of sex discrimination" (citing *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727–28 (7th Cir. 2003)).

Dr. Clemmons protests that although she did not expressly invoke race discrimination in her grievance, she used a number of "somewhat magical" words like "bias," "prejudice," and "hostile work environment." But the case law of this Court makes clear that the use of such

words, untethered to an allegation that the conduct occurred because of membership in a protected class, is not enough to transform a workplace complaint into protected activity. *See, e.g., Gibbs v. Washington Metro. Area Transit Auth.*, 48 F. Supp. 3d 110, 133 n.8 (D.D.C. 2014) ("Mere use of the word 'bias' in the absence of an explanation of whether this bias constitutes discrimination in violation of Title VII is akin to the bare use of the word 'discrimination' which without any discussion of a protected basis is insufficient to create protected activity."); *Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp. 3d 90, 144–46 (D.D.C. Mar. 31, 2014) (same); *Hunter*, 905 F. Supp. 2d at 379–80 (holding that use of the phrase "discriminatory practices" was not enough to make complaint protected when the substance of the complaint suggested "discrimination on the basis of cronyism—a category that is not protected by Title VII"); *Bowyer v. District of Columbia*, 910 F. Supp. 2d 173, 209–11 (D.D.C. 2012) (holding that no reasonable jury could find that plaintiffs engaged in protected activity when they complained about supervisors spreading misinformation about them and creating a "hostile work environment," but did not allege that it was racially motivated).

A fair reading of the grievance and follow-up emails to Ms. McClintock suggests that Dr. Clemmons believed that the mobbing was motivated by GSCP's desire to "cover[] up shortcomings within their own team," Def.'s Ex. O-1, or "to try to cover up their gaps in technical expertise," Def.'s Ex. O-9, and not by racial discrimination. The fact that Dr. Clemmons later identified the races of those involved is not enough to transform a complaint of professional undermining based on a desire to cover up incompetence into a complaint of race-based harassment. *See Broderick*, 437 F.3d at 1232 (citing *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1010 (8th Cir. 2005) for the proposition that "commenting about absence of black employees [in management positions], without alleging discrimination, was insufficient to

qualify as protected activity"); *see also Gates v. Caterpillar, Inc.*, 513 F.3d 680, 687–89 (7th Cir. 2008) (suggesting without deciding that female plaintiff's repeated complaints about being treated unfairly as compared to a male employee, where plaintiff did not expressly complain of gender discrimination, did not satisfy the "protected activity" inquiry); *Pope*, 406 F.3d at 1010 (holding that where plaintiff "shared his observation that there were no blacks in the district-manager position" but "did not attribute the absence . . . to racial discrimination," he failed to engage in statutorily protected activity that could support a claim of retaliation); *Aspilaire v. Wyeth Pharm., Inc.*, 612 F. Supp. 2d 289, 310 (S.D.N.Y. 2009) ("[T]he mere fact that the group making the complaints was African American will not convert an ordinary complaint into a complaint of racial discrimination sufficient to put the employer on notice of such discrimination," because "it is not the constitution of the complaining group that renders speech protected, but rather the articulated complaint itself.").  Nor can the fact that other individuals at AED may have believed that the harassment had a racial component save Dr. Clemmons's grievance.  "References to the observations and perceptions of others are not evidence that [the plaintiff] complained of activity made unlawful by Title VII."  *Cole v. Boeing Co.*, 2014 WL 5795124, at *7 (granting summary judgment to defendant where plaintiff complained of male employee's harassment, false accusations, and defamation, but did not explicitly allege unlawful discrimination on the basis of gender).

On these facts, and in light of Dr. Clemmons's conscious decision to exclude any mention of race from her mobbing grievance, to attribute the mobbing to covering up incompetence rather than to racial animus, and to refrain from any explicit reference to harassment based on a protected category, the Court finds that Dr. Clemmons has failed to show that she engaged in protected activity by filing her mobbing grievance with HR or by

participating in the subsequent investigation prior to sending the January 15 email.  Certainly, the

January 15 email, which explicitly complained of retaliation and mobbing "based on

discrimination and unfair treatment based on race," Def.'s Ex. O-29, constituted protected

activity.  But Dr. Clemmons does not argue that she was retaliated against for sending the

January 15 email, and the allegedly retaliatory events about which she complains pre-date

January 15, 2009.  Accordingly, no reasonable jury could find that Dr. Clemmons was retaliated

against for engaging in protected activity, and the Court will not vacate its Order granting

summary judgment to AED as to Dr. Clemmons's claim of retaliation.

### C.  The Court's Decision to Deny Spoliation-Related Adverse Inferences

Dr. Clemmons's final argument is that the Court "clearly erred in failing to grant a

spoliation inference."  Pl.'s Mot. Alter Jdgmt. at 20.  In her summary judgment briefing, Dr.

Clemmons argued that AED's failure to preserve the email accounts of its former employees

after the SHARP program ended and the company was acquired by FHI 360, despite having been

told to preserve evidence, warrants multiple spoliation inferences.  Pl.'s Opp'n to Def.'s Mot.

Summ. J. at 44–49.  First, she argued, because "very few email communications among Nachbar,

Larsen, McCown or Moskov, have been produced . . . [t]he court should infer that AED

destroyed further evidence of the close relationship amongst them and the conspiratorial tone of

their criticism of Clemmons."  *Id.* at 48.  Second, because AED produced only three emails from

Mr. Beadle to Ms. McClintock that were sent on October 27, 2008, when Mr. Beadle recalled

sending a "slew of emails," the Court should "infer either that Beadle intentionally did not send

[the] public lynching email to McClintock or that McClintock negligently failed to read it."  *Id.*

at 41.  And third, because Mr. Beadle said that he had 457 emails about SHARP-GSCP

interactions but failed to produce them all, "[t]he court should infer that AED destroyed evidence

of additional instances in which Nachbar, Larsen, McCown and Kaplan addressed unsupported criticism of Clemmons to Beadle." *Id.* at 42.[11]

After considering Dr. Clemmons's arguments, the Court took "no position" on whether the alleged spoliation occurred, finding that "any lost evidence was harmless because the adverse inferences that Dr. Clemmons seeks would not create a genuine dispute of material fact as to any of her causes of action." *Clemmons*, 2014 WL 4851739, at *21. Dr. Clemmons construes this holding as stating the Court believed that the contents of the destroyed emails were not relevant to her suit, and she argues that a party need only make a "very slight showing" of relevance to obtain a spoliation inference. *Id.* at 21 (quoting *Gerlich v. U.S. DOJ*, 711 F.3d 161, 172 (D.C. Cir. 2013)). Because she believes she made such a showing, she contends that the Court's finding that the deleted emails were irrelevant was clear error.

Dr. Clemmons appears to misunderstand the Court's decision. "Spoliation," or "the destruction or . . . failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation," *Clarke v. Wash. Metropolitan Area Transit Auth.*, 904 F. Supp. 2d 11, 20 (D.D.C. 2012) (internal quotation marks omitted), can give rise to an issue-related sanction like an adverse inference if certain conditions are met. To obtain an adverse inference, the moving party must show that: (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated

---

[11] Previously, Dr. Clemmons requested a fourth inference related to her defamation claim, *see id.* at 42, but she does not take issue with this aspect of the Court's decision in her motion to alter or amend judgment, *see* Pl.'s Mot. Alter Jdgmt. at 21–22, so the Court will not address the subject further.

evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defense of the party that sought it. *See Mazloum v. D.C. Metro. Police Dep't*, 530 F. Supp. 2d 282, 291 (D.D.C. 2008) (citations omitted).

Generally, spoliated evidence is considered relevant "not [just in] the ordinary meaning of the term, but also [in] that the destroyed evidence would have been favorable to the movant." *Zhi Chen v. District of Columbia*, 839 F. Supp. 2d 7, 14 (D.D.C. 2011). But as the Court previously explained, even when spoliated evidence may have been favorable to the movant, the adverse inference must also "be sufficient to create a genuine issue of material fact" in order to avoid summary judgment. *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 28 (D.C. Cir. 2013). In this case, the Court did not hold that the contents of the deleted emails were irrelevant, or that they did not contain information favorable to Dr. Clemmons. Rather, the Court explained that even if they did contain precisely the information that Dr. Clemmons alleged and warranted the inferences she requested, those inferences were not sufficient to create a genuine issue of material fact that would allow her to survive AED's motion for summary judgment. *Clemmons*, 2014 WL 4851739, at *20–21. In other words, even if deleted emails revealed that Ms. Nachbar, Ms. Larsen, Ms. McCown, or Ms. Msokov were close friends who criticized Dr. Clemmons amongst themselves or to Mr. Beadle, that would have had no bearing on the Court's finding that Dr. Clemmons failed to establish that the harassment she actually experienced was objectively severe or pervasive. *See id.* Similarly, the fact that AED may have been negligent in investigating her mobbing grievance is an issue that the Court did not need to reach because Dr. Clemmons failed to establish that the alleged hostile acts were sufficiently severe or pervasive, which in turn meant that the Court did not need to determine whether AED was liable for the harassment due to a negligent failure to redress the situation properly. *Id.* at *12 n.4, *21.

In sum, Dr. Clemmons failed to show that any of the requested adverse inferences could generate a genuine dispute of material fact and stave off summary judgment as to either her hostile work environment or retaliation claims.  The Court did not clearly err by denying her request for an adverse inference on this basis.  *See Grosdidier*, 709 F.3d at 28 (holding that even where destroyed notes were likely to have had relevant information favorable to the plaintiff, "favorable evidence is not in all instances equivalent to evidence that would permit [a plaintiff] to survive summary judgment," and the inference requested "must be sufficient to create a genuine issue of material fact, not simply one that lends some support to her" position); *Burley v. Nat'l Passenger Rail Corp.*, 33 F. Supp. 3d 61, 70 (D.D.C. 2014) (explaining that plaintiff's "request for a spoliation inference in connection with a videotape of the accident would not create a genuine issue of material fact" and granting defendant's motion for summary judgment).

## V.  CONCLUSION

For the foregoing reasons, Dr. Clemmons's motion to alter or amend judgment is **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  June 4, 2015                                              RUDOLPH CONTRERAS
                                                                           United States District Judge